IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) No. 78708-0-I
Respondent, )
) DIVISION ONE
v. )
) PUBLISHED IN PART
ELI HIKMAT MANSOUR, )
)
Appellant. )
_____ )

SMITH, J. — Eli Mansour appeals his conviction of child molestation in the first degree for abusing his daughter, A.M. He contends that the trial court erred by using A.M.'s initials rather than her full name in the to-convict instruction, that the use of A.M.'s initials in various court filings violated Mansour's right to a public trial, that the prosecutor committed reversible misconduct, and that the trial court erred by denying Mansour's request for a Special Sex Offender Sentencing Alternative (SSOSA). He also challenges a number of community custody conditions imposed as part of his sentence.

In the published part of this opinion, we hold that contrary to Mansour's contentions, the use of A.M.'s initials in the to-convict instruction did not constitute a judicial comment on the evidence or relieve the State of its burden of proof. We also hold that the use of A.M.'s initials did not constitute a court closure and, thus, did not violate Mansour's public trial right.

Citations and pin cites are based on the Westlaw online version of the cited material.

In the unpublished part of this opinion, we hold that although some of the prosecutor's comments during closing were improper, they do not warrant reversal. We also hold that the trial court did not abuse its discretion by denying Mansour's request for a SSOSA sentence. But we hold that the community custody condition directing Mansour not to "form relationships" with families with minor children, except as approved by his community corrections officer (CCO), is unconstitutionally vague, and we accept the State's concession that the condition requiring Mansour to complete "identified interventions" should be stricken. We therefore remand to the trial court to revise appendix 4.2 to the judgment and sentence as follows: (1) strike "or form relationships with families" from condition 8 and (2) strike condition 25. Otherwise, we affirm.

FACTS

A.M. was born to Mansour and his then girlfriend, Roxanne Pinto, in August 2008. According to Pinto, she and Mansour fought a lot and "were drinking quite a bit" when A.M. was first born. Pinto later recalled that when A.M. was about two years old, she and Mansour "smoked pills and then eventually it turned to meth." Mansour's father, Joe Mansour, called Child Protective Services (CPS), and after a family planning meeting, A.M. was placed with Joe and Mansour's mother, Gail.[1] A.M. lived with Joe and Gail from the time she was two and a half years old until she was just under five years old. Meanwhile, Mansour went to treatment, and eventually, A.M. moved back with Mansour. Joe believed

---

[1] Because Mansour and his parents share a last name, we refer to Mansour's parents by their first names for clarity.

that Pinto had her own place at the time but would also stay with Mansour and A.M.

Joe later testified that sometime in 2014, Mansour called him to tell him that Pinto had relapsed and that he needed Joe and Gail, who had since moved to Arizona, to "come back and help with [A.M.]" Joe asked Mansour whether he would be willing to let A.M. go to Arizona, and A.M. ultimately went to Arizona with Joe and Gail for a time. Meanwhile, Pinto went to California to help her mother and to try to "get clean."

According to Joe's later testimony, A.M. moved back to Washington at the end of May 2014. By that time, Mansour had begun dating Mary Barbour. In January 2015, Mansour, Barbour, and A.M. moved to Arizona. They stayed there until August 2015, when they moved back to Washington after Barbour became pregnant. A.M.'s half sister, L.M., was born in March 2016, when A.M. was seven years old. Eventually, Mansour, Barbour, A.M., and L.M. moved into a house in Mountlake Terrace that they rented from Joe and Gail.

On September 17, 2016, after a morning of shopping with Barbour, L.M., Barbour's sister Carolyn Wilson, and Wilson's daughter, A.M. asked if she could spend the night with Wilson. Wilson later testified that during the lengthy drive to her home in Redmond, A.M. disclosed to Wilson that Mansour had sexually abused her. Wilson later called 9-1-1 to report A.M.'s disclosure.

On February 20, 2017, the State charged Mansour by information with one count of first degree rape of a child. The State later added one count of first degree child molestation. Trial took place over more than two weeks in April and

3

early May 2018. Mansour's defense theory was that A.M.'s disclosure was false and resulted from a "perfect storm" of influences. These included Pinto, with whom A.M. had recently gotten back in touch by phone and who, according to Mansour, "desperately wanted her daughter back." The "perfect storm" also included A.M.'s "tough childhood"; A.M.'s feeling replaced by L.M.; A.M.'s decision to talk to Wilson, who Mansour argued was "prone to fabrication . . . [and] to sensationalism"; the presence of guests, including men, who had recently spent the night at the house where Mansour, Barbour, A.M., and L.M. lived; A.M.'s access to cable television; and an inadequate investigation by law enforcement.

The jury was ultimately deadlocked as to the charge of first degree rape of a child, and the trial court later dismissed that charge. The jury found Mansour guilty of first degree child molestation. The trial court sentenced Mansour to an indeterminate term of 64 months to life in confinement and imposed a lifetime term of community custody. Mansour appeals. Additional facts relevant to the issues on appeal are set forth in the discussion of those issues below.

## ANALYSIS

### Use of A.M.'s Initials

Mansour contends that the use of A.M.'s initials, instead of her full name, in the to-convict instruction (1) constituted an impermissible judicial comment on the evidence, (2) relieved the State of its burden of proof, and (3) together with the use of A.M.'s initials in other court documents, amounted to a court closure in violation of Mansour's right to a public trial. We disagree.

4

*Use of Initials as Judicial Comment on the Evidence*

Article 4, section 16 of the Washington Constitution provides that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." This constitutional provision prohibits a judge "from 'conveying to the jury his or her personal attitudes toward the merits of the case' or instructing a jury that 'matters of fact have been established as a matter of law.'" State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (quoting State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)). A claimed error alleging an improper judicial comment on the evidence may be raised for the first time on appeal. Levy, 156 Wn.2d at 719-20. We review de novo whether a jury instruction constituted an improper comment on the evidence "within the context of the jury instructions as a whole." Levy, 156 Wn.2d at 721.

Here, the to-convict instruction for the child molestation charge provided in relevant part:

> To convict the defendant of the crime of Child Molestation in the First Degree, . . . each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 1st day of May, 2016, through on or about the 17th day of September, 2016, . . . the defendant had sexual contact with A.M.;
>
> (2) That A.M. was less than twelve years old at the time of the sexual contact and was not married to the defendant;
>
> (3) That A.M. was at least thirty-six months younger than the defendant; and
>
> (4) That this act occurred in the State of Washington.

Mansour contends that the trial court's use of A.M.'s initials in this to-convict

instruction constituted a judicial comment on the evidence because it "conveyed to the jury that the court considered her a victim."

But the name of the victim of child molestation is not a factual issue requiring resolution. Therefore, identifying A.M. in the to-convict instruction, whether by full name or initials, did not impermissibly instruct the jury that a matter of fact had been established as a matter of law. See Levy, 156 Wn.2d at 722 (concluding that court's use of a robbery victim's name in the to-convict instruction was not a comment on the evidence because the victim's name is not an element of robbery). And a juror would likely not presume that A.M. was a victim—or believe the court considered her one—merely because the court chose to use A.M.'s initials. Indeed, we have observed that even the court's use of the term "victim" has "ordinarily been held not to convey to the jury the court's personal opinion of the case." State v. Alger, 31 Wn. App. 244, 249, 640 P.2d 44 (1982). Therefore, we are unpersuaded that the use of A.M.'s initials in the to-convict instruction conveyed anything to the jury about the judge's "'personal attitudes toward the merits of the case,'" much less that the judge considered A.M. a victim. Levy, 156 Wn.2d at 721 (quoting Becker, 132 Wn.2d at 64).

Furthermore, the federal cases on which Mansour relies are not persuasive. Both were civil cases in which the respective plaintiffs sought to use pseudonyms to conceal their identities *throughout* trial. See Doe v. Cabrera, 307 F.R.D. 1, 2 n.2 (D.D.C. 2014) ("[T]he plaintiff will be permitted to use a pseudonym throughout the pretrial process, but not at trial, if there is a trial in this case."); Doe v. Rose, No. CV-15-07503-MWF-JCx, 2016 WL 9150620, at *1

(C.D. Cal. Sept. 22, 2016) (court order) ("The Court reserved for the pretrial conference the question of whether Plaintiff would be permitted to use a pseudonym at trial."). Here, by contrast, A.M. was referred to by her full name throughout trial; her identity was not concealed. For these reasons, we hold that the use of A.M.'s initials in the to-convict instruction was not a judicial comment on the evidence.

*Use of Initials as Relieving State of its Burden of Proof*

Mansour next contends that "[t]he use of [A.M.]'s initials in the 'to convict' instruction . . . undermined the presumption of innocence by preemptively telling the jury that the court was protecting her as a victim" and that "[t]his was a powerful shifting of the burden onto Mr. Mansour to prove [A.M.] was not in fact his victim." He contends further that "[t]his deprived Mr. Mansour of his constitutional right to due process and to a fair and impartial jury." We disagree.

"Instructions must convey to the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt." State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). "It is reversible error to instruct the jury in a manner relieving the State of its burden to prove every element of a crime beyond a reasonable doubt." Bennett, 161 Wn.2d at 307. An allegation that a jury instruction relieved the State of its burden is an error of constitutional magnitude reviewable for the first time on appeal. State v. Ridgley, 141 Wn. App. 771, 779, 174 P.3d 105 (2007). We review challenged jury instructions de novo in the context of the instructions as a whole. Bennett, 161 Wn.2d at 307.

Here, as discussed, a juror would likely not presume that A.M. was a victim simply because of the use of her initials. Furthermore, the jury was specifically instructed that Mansour was presumed innocent and that the State must prove all elements of child molestation beyond a reasonable doubt. In short, the instructions, when viewed as a whole, did not undermine the presumption of innocence or relieve the State of its burden of proof. Therefore, we hold that the use of A.M.'s initials in the to-convict instruction did not deprive Mansour of due process or his right to a fair and impartial jury.

*Use of Initials as Court Closure*

Finally, Mansour contends that the use of A.M.'s initials in the to-convict instruction and in various court documents violated Mansour's right to a public trial. We disagree.

"Both our federal and state constitutions guarantee a criminal defendant's right to a public trial." State v. Turpin, 190 Wn. App. 815, 818, 360 P.3d 965 (2015). And "[a]rticle I, section 10 of the Washington Constitution provides an additional guaranty of open court proceedings." Turpin, 190 Wn. App. at 818. "An alleged violation of the right to a public trial presents a question of law that this court reviews de novo." Turpin, 190 Wn. App. at 818. A public trial claim may be raised for the first time on appeal. Turpin, 190 Wn. App. at 819.

Here, Mansour asserts that the use of A.M.'s initials constituted a court closure for which the trial court was required to conduct an on-the-record analysis applying the framework set forth in Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 640 P.2d 716 (1982). He argues further that because the trial court

8

did not conduct that analysis, reversal is required.

But an Ishikawa analysis is required only if the public trial right has been implicated and if a closure has occurred. Specifically, to determine whether a closure was justified, courts apply a three-part test. State v. Smith, 181 Wn.2d 508, 513-14, 334 P.3d 1049 (2014). First, the court asks whether the proceeding at issue implicates the public trial right. Smith, 181 Wn.2d at 514. If the answer is yes, the court next asks whether there was a closure. Smith, 181 Wn.2d at 520. Finally, and only if the answer to that question is also yes, the court must determine whether the closure was justified by applying the framework set forth in Ishikawa. See State v. Bone-Club, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995) (courts apply and weigh the five factors set forth in Ishikawa when determining whether to close a courtroom).

With regard to the second part of the test, our Supreme Court has recognized two types of courtroom closures: First, "'when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave,'" and second, "where a portion of a trial is held someplace 'inaccessible' to spectators." State v. Love, 183 Wn.2d 598, 606, 354 P.3d 841 (2015) (quoting State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)).

Here, A.M. testified using her full name in open court and was consistently referred to by her full name throughout the proceedings. Furthermore, A.M.'s name was fully accessible to spectators and open to any member of the public who appeared in court or read a transcript of the court proceedings. In short, no closure occurred, and thus, no Ishikawa analysis was required.

9

Mansour disagrees and relies on Hundtofte v. Encarnacion, 181 Wn.2d 1, 330 P.3d 168 (2014) (plurality opinion), to argue that the use of A.M.'s initials constituted a closure. But Hundtofte is distinguishable because it involved a motion to alter an *existing* court record by *replacing* the defendants' full names with their initials. 181 Wn.2d at 12 (Madsen, C.J., concurring). Here, by contrast, Mansour challenges the use of A.M.'s initials in the first instance. Furthermore, Hundtofte was a plurality opinion in which the justice concurring on the narrowest grounds concluded that no Ishikawa analysis was necessary because the issue was entirely controlled by GR 15. See Hundtofte, 181 Wn.2d at 12 (Madsen, C.J., concurring); see also Kitsap All. of Prop. Owners v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 152 Wn. App. 190, 197, 217 P.3d 365 (2009) ("When dealing with a plurality opinion, the holding of the court is the position of the justice(s) concurring on the narrowest grounds."). For these reasons, Hundtofte does not support the proposition that an Ishikawa analysis was required here.

Mansour also relies on Allied Daily Newspapers of Washington v. Eikenberry, 121 Wn.2d 205, 848 P.2d 1258 (1993), to argue that the use of A.M.'s initials constituted a closure. But Allied Daily Newspapers involved a challenge to a statute that required courts "to ensure that information identifying child victims of sexual assault is not disclosed to the public or press *during the course of judicial proceedings or in any court records.*" 121 Wn.2d at 207 (emphasis added). Here, by contrast, the public did have access to information identifying A.M. by her full name.

Finally, Mansour cites Doe G v. Department of Corrections, in which our Supreme Court concluded an Ishikawa analysis was required to determine whether litigants should be allowed to proceed with litigation using pseudonyms. 190 Wn.2d 185, 198-99, 410 P.3d 1156 (2018).  But like the federal pseudonyms cases on which Mansour relies, Doe G is distinguishable because A.M. was not a party seeking to conceal her identity entirely by litigating under a pseudonym. Therefore, Doe G does not control.

For the reasons set forth above and discussed below in the unpublished part of this opinion, we affirm in part and remand to the trial court to revise appendix 4.2 to the judgment and sentence as follows: (1) strike "or form relationships with families" from condition 8 and (2) strike condition 25.

The remainder of this opinion has no precedential value.  Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.  See RCW 2.06.040.

*Unpublished Text Follows*

ADDITIONAL FACTS

During Mansour's trial, the jury heard testimony from a number of witnesses.  Wilson testified, regarding A.M.'s disclosure of her father's abuse, that during the drive to Wilson's home in Redmond, A.M. "started talking" and "at some point [Wilson] heard [A.M.] mention that there was a strange man coming into her room at night and talking to her."  According to Wilson, A.M. stated that she recognized the man as her father, then asked Wilson if she could keep a secret.  After Wilson responded yes, A.M. disclosed that Mansour had sexually

abused her.  Wilson also testified that she told A.M. that she had been through something similar—even though she had not—to make A.M. feel "comfortable enough to tell me what it was she wanted to say."

Pinto testified about a meeting with Joe and Gail that took place in October 2017, after Mansour was charged, at the Lynnwood hotel where Joe and Gail were staying while traveling from Arizona.  She testified that she took A.M. with her so that Joe and Gail could buy A.M. a tablet to use for school.  Pinto testified that Gail took A.M. to purchase the tablet, and while Pinto was alone with Joe, they had a conversation that left Pinto "under the impression that if [Pinto] could make this entire thing go away that [Joe and Gail] would . . . give [A.M. and Pinto] $50,000 so that we could get a home for us."  Pinto later asked A.M., "Are you positive your dad did this to you?  Are you sure nobody else did this?"  Pinto testified that A.M. reacted angrily and said, "You don't believe me like [Gail] and [Joe]."  When asked whether A.M. "seem[ed] susceptible to the idea . . . that someone else had done this to her," Pinto responded, "No.  No.  Not a doubt in her mind.  Not even for a second."  Pinto acknowledged during her direct examination by the prosecutor that she had been offered immunity for the crime of witness tampering to testify about the conversation in which she suggested to A.M. that someone other than Mansour had abused her.

Joe also testified about the October 2017 meeting but recalled that Gail and A.M. were in the room with him and Pinto.  He testified that Pinto said to him, "If you want your son['s] case to go away, . . . all I need is $500 a month, put me in an apartment, me and [A.M.], and your son['s] case will go away.  If you don't

12

do that, he will spend 25 years in prison." Joe testified that he "was shocked" and said, "That's never going to happen. Never going to happen." Joe testified that after his conversation with Pinto, he called the nonemergency police number in Arizona and asked to speak to an officer about potential extortion. He testified that he also wrote an e-mail to an FBI agent friend to ask, "Is there any way you can wire me so we can get that on tape? Or can I tape her?" And, he testified that he hired his own criminal defense attorney.

A.M. also testified about the October 2017 meeting at Joe and Gail's hotel. She recalled that at some point, Joe "grabbed [her] arms and told [her] to tell the truth." She testified that Joe "said that [she] need[s] to tell the truth and tell that [her] dad didn't do this or else he could go to prison for 25 years." A.M. testified that she responded, "I am telling the truth."

The jury also heard testimony from a defense expert, Dr. Daniel Reisberg, a research psychologist. Dr. Reisberg testified that he was not offering an opinion about any aspect of A.M.'s testimony, whether or not A.M. had false memories about what happened, or whether or not A.M. was telling the truth about what Mansour did to her. Instead, he "underst[oo]d [his] testimony to be basically educational," and he "want[ed] the jury to understand what we know about the factors that can sometimes influence memory." Dr. Reisberg testified that he had been testifying as an expert witness "for 20, 25 years" and that in criminal cases, he had only ever testified for the defense. He also testified that although "[t]he number certainly varies year by year," in some years, he would make $80,000 to $90,000 a year just doing consulting work.

13

ANALYSIS

Prosecutorial Misconduct

Mansour contends that reversal is required due to prosecutorial misconduct.  Although we agree with Mansour that some of the prosecutor's comments during Mansour's trial were improper, we conclude that those comments do not warrant reversal.

Prosecutorial misconduct may deprive a defendant of his guaranty to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution.  In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012) (plurality opinion).  "To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).

Here, Mansour contends that the prosecutor's conduct was improper in a number of ways.  Each is addressed below.

*Improper Vouching*

Mansour first contends that the prosecutor engaged in impermissible vouching during closing argument by making the following arguments:

> (1) "[I]t doesn't matter why [Pinto] went to [A.M.] to have that conversation.  Okay?  What matters is just the fact that she actually went and did it.  And then [A.M.]'s reaction.  And you got to see that reaction.  You got to hear about it.  [*A.M.*] *was*

*not on board with that because that's not the truth."*
(Emphasis added.)

(2) "My point here is, the talk about the monitor, the talk about how it would go off if [Mansour] walked down the hall to [A.M.]'s bedroom *is just simply not true.*" (Emphasis added.)

(3) "I think what's notable though is when [Mansour's family] tried to create doubt in [A.M.], it wouldn't work. Once again, *the truth is the truth.*" (Emphasis added.)

(4) "[A.M.] had many chances to change her story. She was asked to change her story, and she didn't. And the reason she didn't, once again, like the sexual knowledge, it's obvious why she didn't, *because the truth is the truth.*" (Emphasis added.)

"Although it is improper for a prosecutor to vouch for a witness's credibility, a prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010) (footnote omitted). "Thus, closing argument does not constitute improper vouching unless it is clear that the prosecutor is not arguing an inference from the evidence, but instead is expressing a personal opinion about credibility." Lewis, 156 Wn. App. at 240. Furthermore, "[w]e review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions." State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

Here, the prosecutor's repeated references to the "truth" were inappropriate and entirely unnecessary, and we do not condone them. Nevertheless, it is apparent from the context of the prosecutor's arguments that he was arguing reasonable inferences from the evidence and was not expressing

15

his personal opinion as to the veracity of the witnesses. Specifically, the arguments numbered (1), (3), and (4) in the list above were reasonable inferences from the evidence that A.M. maintained that her father was her abuser despite efforts by Pinto and the Mansour family to instill doubt in A.M. And argument (2) above, regarding a baby monitor in L.M.'s room, was immediately followed by a summary of evidence from which a reasonable inference could be made that the baby monitor would not turn on just because a person was in the hallway. The prosecutor should have explained why these inferences were reasonable without invoking the word "truth," but viewed in context, the prosecutor's explanations did not constitute improper vouching. Cf. State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) ("Prosecutors may[ ] . . . argue an inference from the evidence, and prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." (quoting State v. Sargent, 40 Wn. App. 340, 344, 698 P.2d 598 (1985))).

Mansour also takes issue with the following argument that the prosecutor made on rebuttal, regarding the immunity agreement with Pinto:

> [Defense counsel] made a big deal and paused and looked at you and rolled her eyes when talking about . . . Pinto's offer of immunity. *Sometimes the truth is more important than a witness tampering charge. That's just how it goes. And that's just a decision that sometimes is going to have to be made.* Okay? If she's not offered immunity, she is not answering those questions. *And the questions were the truth about whether she went to [A.M.] and asked her to change her story.* That's the witness tampering. *Sometimes that deserves to be heard more than she needs to be charged with witness tampering.* That's why she was offered immunity in this particular case. To say it's such a huge deal – if it's such a huge deal, look at the reason behind it. And the reason behind it is simply to get out what really happened. And, once again, not what really happened between [Pinto] extorting Joe and

16

> Gail or Joe influencing [Pinto] and [A.M.]  What happened when [Pinto] decided to go talk to [A.M.]?  *That's the truth that we're interested in.*

(Emphasis added.)  Mansour contends that this argument, too, constituted improper vouching.

But viewed in context, the prosecutor's arguments did not express a personal opinion as to Pinto's veracity.  Rather, the prosecutor was explaining to the jury the reason why immunity was necessary to get Pinto to testify honestly about her attempt to instill doubt in A.M. about whether her father had abused her.  Furthermore, the prosecutor's explanation was a pertinent reply to defense counsel's implication during her closing argument that the immunity agreement should somehow factor against Pinto.[2]  See State v. Carver, 122 Wn. App. 300, 306, 93 P.3d 947 (2004) ("[P]rosecutorial remarks, even if they are improper, are not grounds for reversal if they were invited or provoked by defense counsel, are a pertinent reply to his or her arguments, and are not so prejudicial that a curative instruction would be ineffective.").  Again, the prosecutor should have chosen a word other than "truth" to make his point.  But the prosecutor's argument did not rise to the level of improper vouching.

*Disparaging Defense Witnesses*

Mansour next contends that the prosecutor committed misconduct by disparaging defense witnesses.  First, he points out that the prosecutor argued

---

[2] During her closing argument, defense counsel stated, "And the fact that [Pinto] in order to be even brought here and testify at all, she needed help arranging for a lawyer to be appointed to work out an immunity deal, immunity from prosecution, immunity from prosecution for witness tampering with [A.M.]"

17

that Dr. Reisberg "comes in here and he gets paid $80,000 to $90,000 a year to discredit children. That's kind of my issue with Dr. Reisberg." This attack on Dr. Reisberg's credibility was not a reasonable inference from the evidence and was improper. See State v. Perkins, 97 Wn. App. 453, 459, 983 P.2d 1177 (1999) ("[I]t is improper for a prosecutor to argue from facts not in evidence."). Specifically, although Dr. Reisberg testified that he earned $80,000 to $90,000 in some years doing consulting work and had only ever testified for the defense in criminal cases, he also testified that only a *portion* of his cases involved children reporting abuse.

Second, Mansour contends that the prosecutor committed misconduct by expressing "disgust" with the Mansour family and "personal disdain" toward Barbour. He points out that when discussing the testimony from Wilson, who is Barbour's sister, the prosecutor characterized Wilson as "the black sheep[3] of her family" and then said, "I'm not necessarily – I'm not sure that that's necessarily a bad thing in that family." This comment was also unquestionably improper because it was a statement of personal opinion and was not followed by any marshalling of evidence to support an inference that being the "black sheep" in Wilson's family was not a bad thing.

---

[3] We assume the prosecutor used the term "black sheep" to refer to "a member of a group that stands in conspicuous and unfavorable contrast to the other members esp. by reason of socially undesirable characteristics or behavior." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 228 (2002). "This metaphor is based on the idea that black sheep were less valuable than white ones because it was more difficult to dye their wool different colors. Also, in the 1500s, their color was considered the devil's mark." CHRISTINE AMMER, THE AMERICAN HERITAGE DICTIONARY OF IDIOMS 45 (2d ed. 2013).

Finally, Mansour contends that "[t]he prosecutor tried to cast the Mansour family as criminal, hiring lawyers to protect themselves" and questioned witnesses "to argue that the Mansour's [sic] hiring of private defense attorneys made them untrustworthy." Mansour relies on State v. Reed, in which the prosecutor improperly "appeal[ed] to the hometown instincts of the jury" by "emphasiz[ing] the fact that petitioner's counsel and expert witnesses were outsiders, and that they drove expensive cars." 102 Wn.2d 140, 147, 684 P.2d 699 (1984). Mansour contends that the prosecutor's arguments about the Mansours were "not unlike the impermissible implication in Reed that defense witnesses should not be believed because they were from out of town and drove fancy cars, except here the personal distrust is for defense witnesses with the money to hire defense attorneys."

But here, the prosecutor argued, in closing:

> To kind of sum up [Barbour], Joe, Gail, they all clearly had an agenda. They clearly had something that they wanted you to hear about this case. Okay? The other thing that I would say is that they – these are the people who hired attorneys and . . . wanted to wiretap themselves. They didn't call and report anything to law enforcement. *They went about kind of creating doubt in these allegations over the last year and a half in their own ways. That's what they did. Why? Because they are all invested in* [*Mansour*]. *That's why.*

(Emphasis added.) In other words, unlike in Reed, the prosecutor was not characterizing the Mansours as untrustworthy merely because they had the means to hire attorneys. Rather, the prosecutor referred to the Mansours' hiring of attorneys as an example of the lengths to which they would go to protect Mansour. This was a proper argument regarding motive and bias and did not

19

constitute misconduct.

*Disparaging Defense Counsel*

Mansour next contends that the prosecutor committed misconduct by disparaging defense counsel. He first notes that "in this case, defense counsel had already endured misogynistic, derogatory slurs during cross-examination of . . . Pinto, who called [defense counsel] a 'stupid bitch' and 'fucking bitch.'" Mansour also points out that during the prosecutor's direct examination of Pinto, Pinto testified, before defense counsel was able to object, that defense counsel had asked Joe for $50,000. But it is clear from the record that the prosecutor did not solicit these comments from Pinto, and Mansour cites no authority for the proposition that these unsolicited comments can serve as the basis of a prosecutorial misconduct claim. Accordingly, we conclude they cannot.

Next, Mansour contends that the prosecutor disparaged defense counsel by arguing to the jury, "You are not to make these decisions on sympathy, your own bias, prejudice, or personal preference. *So just because* [*defense counsel*] *is a better dresser than I am, doesn't mean you can vote for her.* Those things are set aside on a case like this." (Emphasis added.)

At first glance and without any context, the prosecutor's characterization of the jury's decision as a "vote" between the prosecutor and defense counsel inappropriately suggested that the jury's function is to choose between counsel rather than determine whether the State met its burden. Additionally, the prosecutor's reference to defense counsel's attire could be viewed as an effort to reduce her case to her attire and make her seem less likeable and, thus, less

credible.[4]  The State attempts to couch defense counsel's comment as a

compliment by arguing that "[i]t is not disparagement to say that a person

dresses well," but the compliment was at best a backhanded one.[5]  In short,

when viewed in a vacuum, the prosecutor's characterization of the jury's decision

as a "vote" between the prosecutor and defense counsel, together with the

prosecutor's comment about defense counsel's attire, were improper.

However, the prosecutor made his "voting" argument in the context of

discussing jury instruction 1, in which the court instructed the jury that it must

reach its decision "based on the facts proved to you and on the law given to you,

not on sympathy, conscious bias, unconscious bias, prejudice, or personal

preference."  Viewed in this context, the prosecutor's statement was an

---

[4] See Jane M. Siegel, Thank You, Sarah Palin, For Reminding Us: It's Not About The Clothes, 17 VIRG. J. OF SOC. POL'Y & L. 144 (2009) ("To focus on a woman's appearance is to diminish her substance."); see also Maureen A. Howard, Beyond a Reasonable Doubt: One Size Does Not Fit All When It Comes To Courtroom Attire For Women, 45 GONZ. L. REV. 209, 222-23 (2010) (observing that "a defense lawyer's job—in addition to thwarting the prosecutor with respect to the evidence—is to wrap her client in the positive impression the jury (hopefully) has of her" and that "the conventional wisdom on courtroom attire . . . may have some merit" given that "[c]riminal defense lawyers . . . do not want jurors to misperceive them as a 'hired gun.'").

[5] Indeed, the prosecutor's comment ran the risk, whether intentionally or not, of conjuring the jury's own preconceptions and biases about how a female attorney should be dressed.  See Howard, supra, at 223-24 ("When preparing for trial, a lawyer needs to anticipate and consider jurors' expectations, preconceptions and biases about wardrobe and physical appearance.  This analysis can be particularly complicated for the female trial lawyer.  It may not be your mother's courtroom, but your (or someone else's) mother may be on the jury, harboring outdated or discriminatory expectations about 'appropriate' courtroom attire for women."); see also Karen Erger, The Appearance of Professionalism, 102 Ill. B.J. 300, 300 (2014) (observing, "Women lawyers are perpetually under the sartorial microscope.").

inappropriately worded attempt to remind the jury that it was not to decide the case based on its personal feelings about the prosecutor and defense counsel. Though the prosecutor made an inappropriate choice of words and should not have called attention to defense counsel's attire, given the context of the entire argument, his statement did not impermissibly disparage defense counsel. Nor did it, as Mansour also argues, mischaracterize the burden of proof given the context in which it was made.

Mansour next argues that the prosecutor committed reversible misconduct by stating, about A.M.'s testimony, "[I]f you do get the same story every time, somebody like Dr. Reisberg or [defense counsel] is going to be jumping up and down saying this kid was coached." But this argument was made to explain to the jury that some inconsistencies in A.M.'s story were expected, and had her story been the same every time, defense counsel likely would have argued that A.M. had been coached. It did not constitute a disparagement of defense counsel and was not improper.

Mansour next contends that the prosecutor improperly "implied Joe . . . was working closely with his son's defense counsel, asking, 'how many times did you discuss your testimony that you gave here today with [defense counsel] before coming here today and giving it?'" But this question was relevant to Joe's potential bias and credibility. Posing it was not improper.

Mansour next asserts that the prosecutor "accused defense counsel of bullying the State's witnesses through cross-examination." Specifically, Mansour takes issue with the following argument that the prosecutor made on rebuttal:

22

A little bit more about [Wilson]. I think that, once again, it's good that what we say is not evidence because you will be the ones to determine how [defense counsel]'s questions went with [Wilson] regarding the timing of when she decided to tell [A.M.] that something similar happened to her. Okay? And [defense counsel] just said that she tried to make her questions as clear as possible. The way I recall it was completely the opposite. The questions were not clear. They were confusing. And we eventually had to take a break because [Wilson] was trying to get forced into an answer that she didn't understand. So, those questions were not clear at all. And the evidence does not support the fact that [Wilson] told [A.M.] about what had allegedly happened to her . . . until [A.M.] got to the second portion of the conversation where she said something is really, really, really gross. And then she talked about how it went in her mouth. That's what [Wilson] said. You will be the ones who decide what you heard. Your notes hopefully have that in there. But, once again, just because [defense counsel] says it was the other way, that's not necessarily true.

These arguments were invited by defense counsel's argument that she had been "very careful" with the questions she posed to Wilson. They also were invited by defense counsel's claim that at the point that Wilson told A.M. in the car that something similar had happened to her, A.M. "had only said . . . that a strange man had come into her room at night talking to her." See Carver, 122 Wn. App. at 306 ("[P]rosecutorial remarks, even if they are improper, are not grounds for reversal if they were invited or provoked by defense counsel, are a pertinent reply to his or her arguments, and are not so prejudicial that a curative instruction would be ineffective."). Furthermore, the prosecutor's arguments were supported by the evidence because during defense counsel's cross-examination of Wilson, Wilson indicated that she was "a little overwhelm[ed] to be up here and having to talk about all this," indicated that she was trying to answer defense counsel's questions but "I feel like that's not a good enough response for you," described defense counsel as "very pushy," and, after a recess, indicated that defense

23

counsel's questions had been "confusing." For these reasons, the prosecutor's comments were not improper.

Mansour also contends that the prosecutor committed misconduct by arguing that the jury should keep in mind "why someone is saying something. Even [defense counsel]. Why is she saying what she's saying?" This statement was improper because it called into question defense counsel's motives. See State v. Lindsay, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014) ("[A] prosecutor must not impugn the role or integrity of defense counsel."). And having reviewed the record, we are not persuaded by the State's assertion that the prosecutor's statement was related to or invited by defense counsel's argument that she was "proud" to represent Mansour.

*Misstating the Burden of Proof*

As a final matter, Mansour contends that the prosecutor committed misconduct by misstating the burden of proof. Specifically, Mansour takes issue with the following argument from the prosecutor's rebuttal:

> Another thing that I think needs to be stated to you correctly is what the burden is. The burden is beyond a reasonable doubt. Okay? Don't elevate the burden. We talked about this in jury selection. Just because this is a sex case versus some other sort of case, you don't get to elevate the burden even higher. That's not how you do this. The burden is beyond a reasonable doubt.
> And the doubt has to be – that doubt has to exist for a reason. You can't just say, well, I have a question about what exactly [Wilson] told Officer Perry. You are going to have questions. *You are going to have a lot of questions. That's just how this goes.*
> *You are also going to have a lot of questions because regardless of the investigation that's done,* [*defense counsel*] *is going to be able to stand up here and poke holes in it.* You could go to the end of the earth and back and there will still be things that a lead investigator forgot to do.

24

Now, I'm not trying to lower the burden by saying that. I'm asking you to keep the burden right where it is. But *just because you have questions about certain aspects, that does not equate to reasonable doubt.* If you have an abiding belief in those four elements on each charge, then you are satisfied beyond a reasonable doubt.

(Emphasis added.) Mansour contends that the italicized portions of the prosecutor's argument misstated and minimized the burden of proof and that the prosecutor admitted as much by arguing that he was "not trying to lower the burden by saying that."

But taken in context, the prosecutor's argument did not mischaracterize the burden of proof. Although the prosecutor wandered perilously close to improperly arguing that certain types of questions *never* amount to reasonable doubt, he closed his argument by correctly stating the "abiding belief" standard, consistent with the instructions given to the jury, i.e., that "[a] reasonable doubt is one for which a reason exists" and that if it had an "abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." Therefore, the prosecutor's argument was not improper.

*Prejudice*

In summary, the prosecutor engaged in improper conduct by disparaging Dr. Reisberg, opining that being a "black sheep" in Mansour's family was not "necessarily a bad thing," and calling defense counsel's motives into question. We also assume for purposes of our analysis that the prosecutor engaged in improper conduct during his opening statement when he quoted from *To Kill a Mockingbird*, saying, "[Y]ou sure can choose your friends, but you can't choose your family." We next consider whether these improper comments were so

25

prejudicial as to warrant reversal, and we conclude that they were not.

If the defendant establishes that a prosecutor's statements are improper, this court "determine[s] whether the defendant was prejudiced under one of two standards of review." State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). "If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760. But if the defendant did not object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting Thorgerson, 172 Wn.2d at 455). We "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762. "'The criterion always is, has such a feeling of prejudice been engendered or located in the minds of the jury as to prevent a [defendant] from having a fair trial?'" Emery, 174 Wn.2d at 762 (alteration in original) (quoting Slattery v. City of Seattle, 169 Wash. 144, 148, 13 P.2d 464 (1932)).

Here, the prosecutor's improper comments do not warrant reversal for the following reasons.

First, defense counsel immediately objected to the prosecutor's opening statement quotation from *To Kill a Mockingbird*, and the trial court immediately reminded the jury "that what the lawyers say is not evidence." This immediate reminder to the jury cured any potential prejudice stemming from the prosecutor's quotation. Furthermore, the quotation was temporally distant from the prosecutor's other improper comments, which were made two weeks later during closing argument. Thus, we are not persuaded that it had a substantial likelihood of affecting the jury's verdict.

Second, defense counsel did not object to the prosecutor's improper comments during closing, and we cannot say that those comments engendered such a feeling of prejudice in the minds of the jury that no curative instruction would have been effective. The prosecutor's three improper comments were made over the course of more than an hour and a half of closing and rebuttal argument in which the prosecutor otherwise argued reasonable inferences from the evidence. Had defense counsel objected, the court could have instructed the jury to disregard the prosecutor's argument that Dr. Reisberg "gets paid . . . to discredit children," that being the black sheep in Wilson's family was not "necessarily a bad thing," and that the jury should consider why defense counsel "is . . .saying what she's saying." Given the isolated nature of these comments within a lengthy closing, a curative instruction would have obviated any resulting prejudice. See Emery, 174 Wn.2d at 763-64 (noting that a curative instruction reiterating that the State bears the burden of proof would have cured any potential prejudice stemming from a prosecutor's improper argument that "could

potentially have confused the jury about its role and the burden of proof"); cf. State v. Monday, 171 Wn.2d 667, 681, 257 P.3d 551 (2011) (holding that reversal was required where "[t]he prosecutor's misconduct tainted nearly every lay witness's testimony").

Third, the cases on which Mansour relies are distinguishable.  In State v. Pierce, we held that the prosecutor's arguments "engendered an incurable prejudice" because they "inflamed the prejudice of the jury against [the defendant] by attributing repugnant and amoral thoughts to him . . . based on . . . speculation and not the evidence," "focused on how shocking and unexpected the crimes were," and "invited the jury to imagine themselves in the position of being murdered in their own homes."  169 Wn. App. 533, 555-56, 280 P.3d 1158 (2012).  And in In re Personal Restraint of Glassman, "the prosecuting attorney made an electronic presentation to the jury that graphically displayed his personal opinion that [the defendant] was 'guilty, guilty, guilty' of the crimes charged."  175 Wn.2d at 699.  Here, the prosecutor's comments, though improper, were not directed at Mansour and were not similarly inflammatory. Accordingly, Pierce and Glassman are not persuasive.

Fourth, Mansour's reliance on State v. Thierry, 190 Wn. App. 680, 360 P.3d 940 (2015), is also misplaced.  We did recognize in Thierry that "'[b]ecause the jury will normally place great confidence in the faithful execution of the obligations of a prosecuting attorney, [a prosecutor's] improper insinuations or suggestions are apt to carry more weight against a defendant.'"  190 Wn. App. at 694 (second alteration in original) (quoting United States v. Solivan, 937 F.2d

1146, 1150 (6th Cir. 1991)). But Thierry is distinguishable because there, the defendant did timely object, "so the efficacy of a curative instruction [was] not at issue." 190 Wn. App. at 693. Here, however, there was no objection. And as discussed, a curative instruction would have obviated any prejudice resulting from the prosecutor's comments regarding defense counsel's motives.

To this end, and as a final matter, Mansour contends his "Defendant's Motion to Prohibit Improper Closing Argument," which he filed in advance of closing, "should be adequate objection to the prosecutor's misconduct." He cites Lindsay for this proposition, but in Lindsay, defense counsel objected by making a mistrial motion due to prosecutorial misconduct "directly *following* the prosecutor's rebuttal closing argument, citing . . . examples." 180 Wn.2d at 430-31 (emphasis added). Mansour cites no authority for the proposition that objection can be made via motion filed *in advance* of closing argument, and thus, we reject that proposition.

Denial of SSOSA

Mansour contends that the trial court erred by denying his request for a SSOSA without considering the required statutory factors. We disagree.

"A SSOSA is a special sentencing alternative that may be available for some people convicted of sex crimes who meet statutory criteria." State v. Osman, 157 Wn.2d 474, 477 n.3, 139 P.3d 334 (2006). In determining whether a statutorily eligible offender should be granted a SSOSA sentence, the court considers several factors:

> [T]he court shall consider whether the offender and the community will benefit from use of this alternative, consider whether the

29

alternative is too lenient in light of the extent and circumstances of the offense, consider whether the offender has victims in addition to the victim of the offense, consider whether the offender is amenable to treatment, consider the risk the offender would present to the community, to the victim, or to persons of similar age and circumstances as the victim, and consider the victim's opinion whether the offender should receive a [SSOSA].

RCW 9.94A.670(4). "The grant of a SSOSA sentence is entirely at a trial court's discretion, so long as the court does not abuse its discretion by denying a SSOSA on an impermissible basis." State v. Sims, 171 Wn.2d 436, 445, 256 P.3d 285 (2011). Washington courts have specified the defendant's race, sex, and religion as impermissible bases for a court's denial of a SSOSA. Osman, 157 Wn.2d at 482 n.8.

Here, nothing in the record indicates that the trial court denied a SSOSA sentence on an impermissible basis. Rather, the record reflects that the trial court gave due consideration to all aspects of sentencing, including whether to grant a SSOSA sentence. For example, the parties argued at length regarding Mansour's amenability to treatment, the presentence investigation reports submitted to the court, and what input was available from A.M. through her counsel in a separate dependency proceeding. And in denying the SSOSA request, the trial court indicated that it was exercising its discretion to "not give a SSOSA here . . . after reviewing all the circumstances and record." Additionally, in imposing the sentence, the court indicated that it had concerns about being too lenient, stating, "And, respectfully, the appropriate consequence after the Court's review . . . in this case is a significant prison term." The court also spoke at length about its concern for A.M. and the "abuse of trust" that was part of the

30

circumstances of Mansour's crime. We conclude, given this sentencing record, that Mansour has not established that the trial court abused its discretion in denying his request for a SSOSA sentence.

Mansour relies on State v. Landsiedel, 165 Wn. App. 886, 889, 269 P.3d 347 (2012), for the proposition that "[w]hen the defendant requests a sentencing alternative authorized by statute, a trial court's failure to consider that alternative is effectively a failure to exercise discretion and is subject to reversal." But as discussed, the record shows that the trial court *did* consider—but ultimately denied—a SSOSA sentence for Mansour. Accordingly, Landsiedel is not persuasive.

Mansour also contends, in his reply brief, that "[i]n no way can the court's cursory determination be read as compliance with consideration of the seven enumerated factors in the statute." But again, the record reflects that the trial court's consideration of the SSOSA request was not merely cursory. Moreover, Mansour's contention amounts to an assertion that the trial court was required to consider each of the statutory factors on the record. Yet he cites no authority to support the proposition that such an on-the-record consideration is required. Accordingly, Mansour's contention fails.

## Community Custody Conditions

"Conditions of community custody are set forth as part of the Sentencing Reform Act of 1981 (SRA)[, chapter 9.94A RCW,] and include conditions that are mandatory, conditions that are presumptively imposed but are waivable, and conditions that are wholly discretionary." State v. Lee, 12 Wn. App. 2d 378, 401,

460 P.3d 701 (2020) (footnote omitted); RCW 9.94A.703(1)-(3). "A court is authorized to impose discretionary community custody conditions as part of a sentence." Lee, 12 Wn. App. 2d at 401; RCW 9.94A.703(3). "Conditions of community custody may be challenged for the first time on appeal and, where the challenge involves a legal question that can be resolved on the existing record, preenforcement." State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). We review community custody conditions for abuse of discretion. Wallmuller, 194 Wn.2d at 238. "A trial court necessarily abuses its discretion if it imposes an unconstitutional community custody condition, and we review constitutional questions de novo." Wallmuller, 194 Wn.2d at 238.

Here, Mansour challenges a number of the community custody conditions imposed at sentencing. Each challenged condition is addressed below.

### Condition 8

Condition 8 directs Mansour not to "date women or form relationships with families who have minor children, as approved or as directed by the supervising [CCO]." The State contends that Mansour invited any error with regard to condition 8 by not objecting when the trial court proposed to add the words "as approved or" to the condition. But the State cites no authority to support its apparent assertion that Mansour invited error merely by acceding to the wording proposed by the court. Cf. State v. Phelps, 113 Wn. App. 347, 353, 57 P.3d 624 (2002) ("The invited error doctrine applies only where the defendant engaged in *some affirmative action* by which he knowingly and voluntarily set up the error." (emphasis added)). Accordingly, we reach the merits of Mansour's challenges to

condition 8.

Mansour contends that condition 8 "interferes with [his] right to intimate association by requiring approval from his CCO in order to be in a relationship with his wife or any intimate partner." But Mansour does not explain how a prohibition on *dating* women or *forming* relationships with families with minor children encompasses an existing *marriage* relationship, and we interpret the prohibition not to apply to that relationship. Indeed, the State does not argue otherwise and instead concedes that condition 8 "does not apply to any relationship that has already been formed."

To the extent that condition 8 applies to relationships other than an existing marriage relationship, it does not impermissibly infringe Mansour's fundamental right to intimate association. See State v. Clinkenbeard, 130 Wn. App. 552, 561, 123 P.3d 872 (2005) (right to intimate association is fundamental right). Specifically, "[b]ecause the SRA expressly authorizes a sentencing court to order that the defendant 'not have direct or indirect contact with the victim of the crime or a specified class of individuals,' a sentencing court may restrict an offender's freedom of association as a condition of sentencing 'if reasonably necessary to accomplish the essential needs of the state and public order.'" State v. Moultrie, 143 Wn. App. 387, 399, 177 P.3d 776 (2008) (footnote omitted) (quoting former RCW 9.94A.700(5)(b) (2003) (now codified as RCW 9.94B.050(5)(b)); State v. Riley, 121 Wn.2d 22, 37-38, 846 P.2d 1365 (1993). Additionally, a condition that constitutes a limitation on a fundamental right must be "imposed sensitively." Riley, 121 Wn.2d at 37.

Here, Mansour was convicted of sexually abusing his young daughter. Because his crime involved a child, prohibiting him from dating women with minor children or forming relationships with families with minor children is reasonably necessary to accomplish the State's essential need to protect children. Cf. State v. Kinzle, 181 Wn. App. 774, 785, 326 P.3d 870 (2014) (holding that sentencing court did not abuse its discretion by prohibiting offender from dating women with minor children or forming relationships with families with minor children because he was convicted of molesting children with whom he came into contact due to a relationship with their parents). Furthermore, the condition is sensitively imposed in that it is not absolute: It allows Mansour to form such relationships upon the approval of his CCO. For these reasons, we conclude that condition 8 does not impermissibly interfere with Mansour's right to intimate association.

But for the reasons that follow, we agree with Mansour that the part of condition 8 prohibiting him from "form[ing] relationships with families who have minor children, as approved or as directed by the supervising [CCO]," is unconstitutionally vague.

Under both the United States and Washington Constitutions, a community custody condition is vague and violates due process if "'(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement.'" Wallmuller, 194 Wn.2d at 238-39 (quoting State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018)). "'[A] . . . condition is not unconstitutionally vague merely because a person cannot predict

with complete certainty the exact point at which his actions would be classified as prohibited conduct.'" Wallmuller, 194 Wn.2d at 239 (alterations in original) (internal quotation marks omitted) (quoting Padilla, 190 Wn.2d at 677). Instead, what is required by the state and federal constitutions is that "'citizens have fair warning of proscribed conduct.'" Wallmuller, 194 Wn.2d at 239 (internal quotation marks omitted) (quoting State v. Sanchez Valencia, 169 Wn.2d 782, 791, 239 P.3d 1059 (2010)). "That standard is satisfied where 'ordinary people can understand what is and is not allowed, and are protected against arbitrary enforcement.'" Wallmuller, 194 Wn.2d at 239 (quoting Sanchez Valencia, 169 Wn.2d at 791).

Although not cited by Mansour, we find State v. Nguyen, 191 Wn.2d 671, 682, 425 P.3d 847 (2018), instructive here. In Nguyen, our Supreme Court held that the term "dating relationship" is *not* unconstitutionally vague because "a person of ordinary intelligence can distinguish a 'dating relationship' from other types of relationships." 191 Wn.2d at 682. In reaching its holding, the court distinguished United States v. Reeves, in which the Second Circuit Court of Appeals held that the term "significant romantic relationship" *was* unconstitutionally vague. 591 F.3d 77, 81 (2d Cir. 2010). The Nguyen court explained that "[t]he terms 'significant' and 'romantic' are highly subjective qualifiers, while 'dating' is an objective standard that is easily understood by persons of ordinary intelligence." 191 Wn.2d at 683.

We conclude that the unqualified term "relationship," as used in the part of condition 8 prohibiting Mansour form "form[ing] relationships" with certain families

absent CCO approval, is even more vague than the term "significant romantic relationship," which the Nguyen court recognized was already problematically subjective. Specifically, in Nguyen, our Supreme Court recognized the definition of "relationship" as "'a state of affairs existing between those having relations.'" 191 Wn.2d at 682 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1916 (2002)). This broad definition could encompass *any* recurring interaction with a family, and it does not provide sufficiently ascertainable standards to protect against a CCO's arbitrary decision as to when such an interaction crosses the threshold into a "relationship." The lack of any qualification on the term "relationship" therefore subjects the condition to the same type of varied and inconsistent interpretations that render the term "significant romantic relationship" unconstitutionally vague. Cf. Reeves, 591 F.3d at 81 (observing that "[w]hat makes a relationship 'romantic,' let alone 'significant' in its romantic depth, can be the subject of endless debate that varies across generations, regions, and genders").

In sum, although condition 8 does not unconstitutionally infringe Mansour's right to intimate association, its prohibition on "form[ing] relationships with families who have minor children, as approved or as directed by the supervising [CCO]" is unconstitutionally vague.

*Conditions 11 and 12*

Condition 11 directs Mansour not to consume alcohol, and condition 12 directs him not to "possess or consume controlled substances unless [he has] a legally issued prescription." Citing State v. Irwin, 191 Wn. App. 644, 364 P.3d

36

830 (2015), Mansour contends that these conditions must be stricken because they are not crime-related.

But the relevant part of Irwin involved a condition imposed under RCW 9.94A.703(3)(f), which lists among the discretionary conditions the court is authorized to impose those ordering an offender to "[c]omply with any crime-related prohibitions." RCW 9.94A.703(3)(f); Irwin, 191 Wn. App. at 656. Crime-related prohibitions imposed under that statute must "'directly relate[ ] to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10).

Conditions 11 and 12 are not crime-related prohibitions imposed under RCW 9.94A.703(3)(f). Rather, condition 11 is authorized under RCW 9.94A.703(3)(e), which provides that the court "may order an offender to . . . [r]efrain from possessing or consuming alcohol." And condition 12 is a waivable condition under RCW 9.94A.703(2)(c), which provides that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [r]efrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions." In other words, unlike the condition in Irwin, conditions 11 and 12 are statutorily authorized whether crime-related or not. Cf. In re Pers. Restraint of Brettell, 6 Wn. App. 2d 161, 173, 430 P.3d 677 (2018) (waivable conditions need not be crime-related); State v. Acevedo, 159 Wn. App. 221, 233, 248 P.3d 526 (2010) (concluding that former SRA provision authorizing court to order offender not to consume alcohol authorized such a prohibition, whether crime-related or not, because the

language did not contain the words "crime related"). Therefore, Mansour's contention fails.

*Condition 13*

Condition 13 directs Mansour to "make good faith attempts to [f]ind and maintain fulltime employment and/or a fulltime educational program during the period of supervision, as directed by the supervising [CCO]." Mansour contends that condition 13 "bears no relationship to his crime of conviction" and "should not be a condition of community custody because it is not crime-related." But condition 13 is expressly authorized as a waivable condition under RCW 9.94A.703(2)(b), providing that "[u]nless waived by the court, . . . the court shall order an offender to . . . [w]ork at department-approved education, employment, or community restitution, or any combination thereof." And as discussed, waivable conditions authorized under RCW 9.94A.703(2) need not be crime-related. Brettell, 6 Wn. App. 2d at 173. Accordingly, Mansour's contention fails.

*Condition 25*

Condition 25 directs Mansour to, "[b]ased on eligibility, enter and successfully complete identified interventions to assist you to improve your skills, relationships, and ability to stay crime free." Mansour contends that condition 25 is overly broad and "does not provide ascertainable standards for enforcement," and the State concedes that condition 25 should be stricken. We accept the State's concession.

We remand to the trial court to revise appendix 4.2 to the judgment and sentence as follows: (1) strike "or form relationships with families" from condition

8 and (2) strike condition 25.  Otherwise, we affirm.

WE CONCUR: