IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent,<br><br>  v.<br><br>DANILO DISTURA,<br><br>    Appellant. | No. 84750-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Danilo Distura appeals his convictions for two counts of rape of a child in the first degree and two counts of child molestation in the first degree. He claims his jury included a biased juror, and he challenges the selection of his jury using remote videoconferencing in violation of his right to a fair trial. He also claims the State committed prosecutorial misconduct, the court impermissibly commented on the evidence, and three of his community custody conditions are either unconstitutional or unrelated to his crime. We affirm his convictions. However, we reverse his sentence and remand to the trial court to correct a scrivener's error and to strike the victim penalty assessment (VPA) and a DNA fee because Distura was indigent when sentenced.

BACKGROUND

The State charged Distura with sex offenses related to his daughter, M.D.—specifically, two counts of rape of a child in the first degree and two counts of child molestation in the first degree, all four with domestic violence designations. After a trial in September 2022, the jury hung on one of the counts for rape of a child but convicted

Distura of all the other counts as charged. Distura received an indeterminate sentence of 170 months to life. The court also imposed the $500 VPA and a $100 DNA collection fee. Distura timely appeals.

## DISCUSSION

Distura raises multiple issues on appeal. First, he alleges his constitutional right to a fair trial was violated because the court seated a biased juror and conducted jury selection remotely via Zoom.[1] He alleges prosecutorial misconduct and that the court commented on the evidence. He also alleges the community custody condition requiring his consent to home searches is constitutionally overbroad and that two other conditions regarding alcohol use and sexual contact are unrelated to his crime. Finally, Distura challenges his sentence based on a scrivener's error and for including VPA and a DNA fee despite his indigence. We address each issue in turn.

I.    Fair trial issues

A.  Actual bias

Distura claims the court violated his constitutional rights by seating a juror who expressed clear bias against him without that juror uttering "any subsequent curative statement of impartiality." The State argues the court acted within its discretion because the juror "made an equivocal statement suggesting a *possibility* of bias." We agree with the State.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution both guarantee a criminal defendant the right to trial by an impartial jury. State v. Njonge, 181 Wn.2d 546, 553, 334 P.3d 1068 (2014). Seating

---

[1] Zoom is a cloud-based videoconferencing software platform. State v. Wade, 28 Wn. App. 2d 100, 104 n.1, 534 P.3d 1221 (2023), review denied, 2 Wn.3d 1018 (2024).

a biased juror violates this right. State v. Guevara Diaz, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (2020).

To protect this right, a party may challenge a juror for cause based on actual bias, defined as "the existence of a state of mind . . . in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging" the potential juror. RCW 4.44.170(2). The fact that a juror expresses or forms an opinion is insufficient to sustain a challenge. RCW 4.44.190. Instead, to sustain a challenge based on actual bias, "the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." Id. Thus, actual bias must be established by proof beyond "a mere possibility." State v. Sassen Van Elsloo, 191 Wn.2d 798, 808-09, 425 P.3d 807 (2018). "[T]he record must demonstrate 'that there was a probability of actual bias.' " Id. at 809 (quoting State v. Noltie, 116 Wn.2d 831, 838-39, 809 P.2d 190 (1991)).

"[E]quivocal answers alone do not require a juror to be removed when challenged for cause, rather, the question is whether a juror with preconceived ideas can set them aside." Noltie, 116 Wn.2d at 839. Indeed, " '[a] trial court need not excuse a juror with preconceived ideas if the juror can set those ideas aside and decide the case on the evidence presented at the trial and the law as provided by the court.' " Guevara Diaz, 11 Wn. App. 2d at 855-56 (quoting State v. Phillips, 6 Wn. App. 2d 651, 662, 431 P.3d 1056 (2018) (citing RCW 4.44.190; State v. Rupe, 108 Wn.2d 734, 748, 743 P.2d 210 (1987))). On the other hand, if the court "has only a 'statement of partiality without a subsequent assurance of impartiality,' a court should 'always' presume juror bias."

Guevara Diaz, 11 Wn. App. 2d at 854 (quoting Miller v. Webb, 385 F.3d 666, 674 (6th Cir. 2004)).

Even if neither party challenges a juror, the trial court has an obligation to excuse a juror where grounds for a challenge for cause exist. RCW 2.36.110 (it "shall be the duty of a judge to excuse . . . any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention . . . ."); see also CrR 6.4(c) (judge "shall excuse" a juror where the judge "is of the opinion that grounds for challenge are present"); State v. Jorden, 103 Wn. App. 221, 227, 11 P.3d 866 (2000) (a trial court has "a continuous obligation . . . to excuse any juror who is unfit and unable to perform the duties of a juror."). But judges should "tread carefully" and "exercise caution before injecting itself into the jury[-]selection process.' " In re Pers. Restraint of Perry, 29 Wn. App. 2d 734, 747, 542 P.3d 168 (2024) (quoting State v. Lawler, 194 Wn. App. 275, 284, 374 P.3d 278, review denied, 186 Wn.2d 1020 (2016)). Otherwise, "a trial court that excuses a juror sua sponte risks disrupting counsel's jury-selection strategy." Id.

A trial court is in the best position to evaluate a juror's ability to be fair and impartial because it can assess the juror's "tone of voice, facial expressions, body language, or other forms of nonverbal communication when making [their] statements." Lawler, 194 Wn. App. at 287. Therefore, we review a trial court's decision not to dismiss a juror for abuse of discretion. Guevara Diaz, 11 Wn. App. 2d at 856. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Sassen Van Elsloo, 191 Wn.2d at 807.

In this case, juror 8[2] answered "yes" to a query on the jury questionnaire: "Do you have any concerns for any reason about your ability to be a fair and impartial juror in this case?" The questionnaire then asked potential jurors answering yes to explain, and juror 8 wrote: "Based on the information provided above, Danilo Distura has multiple counts of sexual abuse against a child. I may be biased against Danilo for being charged with such things. This may affect my ability to be fair." Distura argues this questionnaire answer is an "expression of bias against Mr. Distura."

Distura relies on Guevara Diaz, in which this court reversed because "all that the record clearly shows is that juror 23 said she could not be fair." 11 Wn. App. 2d at 858. The juror at issue in that case answered "no" to a jury questionnaire asking if she could be fair to both sides, and "group-directed" questions could not rehabilitate the juror as there was no record of the juror's responses indicating that they could be fair.[3] But unlike in Guevara Diaz, in the present case, juror 8 provided a written explanation for his "yes" answer to the questionnaire: he explained that "I *may* be biased against Danilo for being charged with such things. This *may* affect my ability to be fair." (Emphasis added). Juror 8's statement is equivocal because the word "may" is not definite; rather, it means to "be in some degree likely to." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1396 (2002).

This case is more akin to Lawler. In that case, Lawler was accused of assaulting his girlfriend, and juror 23 indicated multiple family members were victims of domestic violence. Lawler, 194 Wn. App. at 278-79. The prosecutor asked juror 23 whether his

---

[2] Juror number 8 was prospective juror number 21 during voir dire.

[3] "[Q]uestions directed to the group cannot substitute for individual questioning of a juror who has expressed actual bias." State v. Irby, 187 Wn. App. 183, 196, 347 P.3d 1103 (2015) (citing Hughes v. United States, 258 F.3d 453, 461 (6th Cir. 2001)).

life experiences would make it difficult for him to be fair and impartial. Id. at 279. Juror 23 responded, "I don't see how I could be objective with all that past experience." Id. Then, asked if he could set those experiences aside and follow the court's instructions, juror 23 replied, "I don't think I would be able to do that with all these experiences." Id. at 280. He raised his hand when defense counsel asked if anyone would be uncomfortable serving on the jury. Id. Neither the parties nor the court followed up on juror 23's replies. Id. On appeal, we held that juror 23's statements were "at least slightly equivocal" and not " 'unqualified statement[s] expressing actual bias' " because the statements conveyed "a vague nonspecific discomfort . . . rather than a firm bias." Id. at 287 (quoting State v. Irby, 187 Wn. App. 183, 188, 347 P.3d 1103 (2015)). Further, as the trial court was "alert to the possibility of biased jurors," it did not abuse its discretion by failing to dismiss juror 23 sua sponte. Id. at 287, 289.

Even more than the "slightly equivocal" statement of the juror in Lawler—"I don't think I would be able to do that," i.e., be fair and impartial—here, juror 8's use of the word "may" communicates equivocation. An equivocal answer does not require a juror to be removed for cause. Noltie, 116 Wn.2d at 839. Nor does it demonstrate partiality that requires a subsequent assurance of impartiality.

Juror 8 also did not express unequivocal bias at any other point in voir dire. During group questioning, juror 8 raised his hand to indicate his agreement with other panel members' statements such as "I just don't think a child would just make that up," "it would be hard to believe that a child would go to through this entire process . . . if it were a lie," questioning a child "might be a reason why [a child] wouldn't disclose immediately and why there wouldn't be bodily fluids," "physical evidence would be long,

6

long, long gone," and how victims of sexual assault "might be . . . a little confused over time." While these are general comments favoring the prosecution's theory, they do not demonstrate actual bias as defined by RCW 4.44.170(2), i.e., "a state of mind . . . , which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights" of a defendant.

Moreover, juror 8 did *not* raise his hand to agree with statements posed to the panel that could have indicated bias, such as "I can't look at Danilo, and say, I can give you a fair trial," or "Danilo must have d[one] something wrong or we wouldn't be here." The prosecutor asked juror 8's panel this type of question three times. Five prospective jurors raised their hands the first time, two more the second time, and one more the third time. But juror 8 did not.

In addition to the group questioning, juror 8 was individually questioned once. Defense counsel asked what juror 8 thought of "the Blackstone formula"[4] and if it was "better that 10 guilty people go free than one innocent person be convicted." This colloquy followed:

> Juror 8: I think it depends on the, like, what the guilty people have done. If like, did huge horrendous things, then I don't think it'll -- the 10 people getting away with that, that's too much.
>
> [Defense counsel]: Okay.
>
> Juror 8: But yeah, it depends.
>
> [Defense counsel]: So and if I'm understanding, you would look at it and say, you know, that's a nice thing to say, but if they've done really bad things, I think it's worth the cost of having some innocent people also convicted?
>
> Juror 8: Yeah. Yeah. Or to have one innocent person convicted.

---

[4] "[B]etter that ten guilty persons escape, than that one innocent suffer." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *358 (1769).

7

[Defense counsel]: Okay. Fair enough.

Distura's counsel did not ask juror 8 other questions. Juror 8's responses to this line of questioning were not unequivocal statements indicating actual bias. To the contrary, juror 8 twice said "it depends" rather than indicating a preconceived idea that he could not set aside.

The juror's questionnaire responses, his responses to group questions, and responses to individual questioning were not unequivocal statements that indicated bias and required rehabilitation. We agree with the State that the court did not abuse its discretion by failing to dismiss juror 8 sua sponte because the record shows the juror's questionnaire answer and explanation, group responses, and individual answers were equivocal.

B. Zoom voir dire

Distura argues the court erred by conducting remote voir dire using Zoom because he has "a state constitutional right to in-person jury selection" and because Zoom "constrained [his] ability to accurately assess potential jurors." We adhere to our precedent and reject these arguments.

It is well settled that trial courts have discretion in determining how best to conduct voir dire. State v. Davis, 141 Wn.2d 798, 825, 10 P.3d 977 (2000). " '[A]bsent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced, a trial court's ruling on the scope and content of voir dire will not be disturbed on appeal.' " State v. Wade, 28 Wn. App. 2d 100, 111, 534 P.3d 1221 (2023) (citing Davis, 141 Wn.2d at 826), review denied, 2 Wn.3d 1018 (2024).

On the first day of Distura's trial, the court stated it would be "a COVID trial" following a "virtual hybrid" model. At that time, King County Superior Court was operating under the Washington State Supreme Court's fifth revised order regarding court operations during the COVID-19 pandemic, which allowed jury selection using remote technology. Ord. re: Fifth Revised & Extended Ord. Regarding Ct. Operations, No. 25700-B-658, In re Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency, (Wash. Feb. 19, 2021), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/25700-B-658.pdf [https://perma.cc/F2PD-LEXX]. The court then discussed trial mechanics for voir dire with both parties. Most of the potential jurors for Distura's trial elected to appear by Zoom.

Distura argues that under article I, section 21 of the Washington State Constitution, he has an "inviolate" right to a jury trial, or, alternatively, the court's "analysis on why it was choosing jury selection by video was insufficient." But this court has held that trial courts did not abuse their discretion when they relied on the Washington Supreme Court's orders during the COVID-19 pandemic and allowed voir dire over Zoom, so the court here did not err by likewise allowing voir dire over Zoom without stating specific reasons for doing so. Wade, 28 Wn. App. 2d at 116 ("the trial court did not abuse its discretion when it . . . allowed voir dire over Zoom); see also State v. Kiner, No. 83593-9-I, slip op. at 26, 2023 WL 3946837 (Wash. Ct. App. June 12, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/835939.pdf ("The

orders promulgated by our Supreme Court . . . demonstrate that [COVID-19] was a valid reason to conduct voir dire remotely.").[5]

Distura argues that "jury selection did not occur by telephone, telegram, or written correspondence" at the time of the Code of 1881, so article I, section 21 "includes the right to in-person jury selection." But to the contrary, as "past decisions have shown," the "jury function [that] receives constitutional protection from article 1, section 21" is the determination of factual issues. Sofie v. Fibreboard Corp., 112 Wn.2d 636, 648, 771 P.2d 711 (1989). Furthermore, our Supreme Court has inherent authority to administer justice and to ensure the safety of court personnel, litigants, and the public, including by issuing orders such as those regarding court operations during COVID-19, on which the trial court relied for its authority to proceed with a virtual hybrid trial. Wade, 28 Wn. App. 2d at 115 (citing State v. Wadsworth, 139 Wn.2d 724, 741, 991 P.2d 80 (2000)). Finally, reading article I, section 21 to apply to jury selection in a criminal case renders superfluous article I, section 22, which guarantees a criminal defendant the right to trial by an impartial jury. State v. Booth, 24 Wn. App. 2d 586, 604, 521 P.3d 196 (2022), review denied, 526 P.3d 849 (2023). We conclude that by conducting voir dire over Zoom, per the Supreme Court's order, the court neither abused its discretion nor violated article I, section 21.

Distura next argues that remote voir dire "unduly restricted Mr. Distura's rights to select a fair jury and to be physically present with the jury venire." Distura does not argue that *he* was denied presence at the critical stage of voir dire. He argues that he has a right to require the *venire* to be physically present with him. He cites State v. Irby

---

[5] When necessary to a reasoned decision, as here, we may cite an unpublished case. GR 14.1(c).

for this proposition. 170 Wn.2d at 880. But Irby states only that "[a]lthough the right to be present is rooted to a large extent in the confrontation clause . . . , the United States Supreme Court has recognized that this right is also 'protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him.' " 170 Wn.2d at 880-81 (quoting United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985)). Irby does not stand for the proposition that a defendant's due process right to be present—such as during voir dire—encompasses a right to confront persons, such as jurors, who are not witnesses providing evidence against them.[6] We therefore conclude that while Distura has a right to be present during voir dire, he does not have a right to confront the venire in person.

Distura also suggests his rights were violated because technical glitches occurred during remote voir dire that prevented him from fully assessing the potential jurors. But in each incident he cites, the technical glitch was momentary and was resolved. For example, in one instance, the court helped the potential juror find a button to enable video or join voir dire another way. In another, defense counsel asked if there was a technical issue and the juror answered "no." In still another, the prosecutor made an audio adjustment, and the potential juror then stated, "[T]hat's much better." When defense counsel told a potential juror he was "cutting out," the juror simply repeated their answer.

While we have "acknowledg[ed] the necessity that the parties be able to ascertain bias" in potential jurors, we have held that a trial court does not abuse its

---

[6] See also Kiner, No. 83593-9-I, slip op. at 25-26 ("But a defendant's right to confront witnesses against him is inherently different from his right to be present during jury voir dire where there are no witnesses.").

discretion by requiring jurors to wear face masks during jury selection. State v. Bell, 26 Wn. App. 2d 821, 835, 838, 529 P.3d 448, review denied, 1 Wn.3d 1035 (2023). The Bell court recognized the "countervailing need to provide for safety of all participants in the midst of a pandemic," and reasoned that face masks deprived a defendant of "only a small part of [a potential juror's] demeanor." 26 Wn. App. 2d at 835. Like jurors wearing face masks, none of the technical glitches Distura relies on shows how his ability to perceive bias or observe nonverbal communication was "restricted" by remote voir dire. See Bell, 26 Wn. App. at 838. We therefore conclude the court did not abuse its discretion by permitting remote voir dire.

C.  Prosecutorial misconduct

Distura argues the prosecutor committed reversible misconduct by repeatedly referring to the complaining witness as the "victim," despite a preliminary order precluding the use of the term. The State admits this "was technically improper [but] any error was harmless." We agree with the State.

The defendant bears the burden of proving on appeal that prosecutorial misconduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012) (citing State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011)). If an appellant establishes a prosecutor's statement or conduct was improper, we determine whether the defendant below was prejudiced under one of two standards of review. Emery, 174 Wn.2d at 760. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had "a substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760 (citing State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009) (citation omitted)). If the

defendant did not object at trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61 (citing State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). Under this heightened standard, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d at 761 (quoting Thorgerson, 172 Wn.2d at 455).

Thus, we must first determine whether Distura waived any error by failing to object such that the heightened standard applies. A party losing a pretrial motion has a "standing objection" unless instructed by the court to continue to object. State v. Weber, 159 Wn.2d 252, 271, 149 P.3d 646 (2006) (citing State v. Kelly, 102 Wn.2d 188, 193, 685 P.2d 564 (1984) (other citation omitted)). A party who wins a pretrial motion does not. Weber, 159 Wn.2d at 271. Instead, a "commonsense approach" dictates that a party should object so that the trial court can cure any potential prejudice with an instruction, unless "an unusual circumstance exists 'that makes it impossible to avoid the prejudicial impact' " of continuing to object. Weber, 159 Wn.2d at 272 (quoting State v. Sullivan, 69 Wn. App. 167, 173, 847 P.2d 953 (1993)). Examples of unusual circumstances include the " 'deliberate disregard of the trial court's ruling' " or " 'an objection [that] by itself would be so damaging as to be immune from any admonition or curative instruction by the trial court.' " Weber, 159 Wn.2d at 272 (quoting Sullivan, 69 Wn. App. at 173); see also State v. Smith, 189 Wash. 422, 429, 65 P.2d 1075 (1937).

13

When we review whether prosecutorial misconduct requires reversal, we review the misconduct "in the context of the entire case." Thorgerson, 172 Wn.2d at 443.

Here, before trial, the court granted Distura's motion to preclude using the word "victim" to refer to his daughter, M.D. Nonetheless, during voir dire the next day, the prosecutor used the word repeatedly. At times the prosecutor used the word generically, i.e., "a victim," or preceded by the word "alleged," but most frequently the prosecutor said "the victim" or "the victim in this case." Distura did not object to any of these references by the State. Regardless, when the prosecutor used the words "my victim," the court sua sponte intervened:

> [Court]: Counsel, I'm going to have to interrupt you here. Ladies and gentlemen and other persons who are on this call, I just want to make sure that I assure you, this is an allegation alone, and counsel needs to refer to the person as alleged victim. That is very important for you to keep in mind. This is an accused person and alleged victim. It's all a determination to be made by the jury. So I just want to make sure that those terms are clearly stated.

At the next break, outside the jury's presence, the court stated:

> [Court]: Counsel, it's really not my preference to interrupt, but your use of the term "my victims", several times raised a great deal of concern.

> [State]: Sure, I'm sorry.

> [Distura's counsel]: Thank you, Your Honor.

> [Court]: I'm sure it's just habit, but it needs to be a constant, and that's extremely important, especially now when we're talking about burden of proof.

The prosecutor used the approved phrase "alleged victim" during voir dire the next day.

Immediately before trial began the next week, following a discussion of the use of names and initials in the case, the court "urge[d]" the prosecutor to use the term

14

"alleged victim." Then, the following exchange occurred during the prosecutor's direct examination of M.D.:

> [State]: Your Honor, with the court's permission may the witness step off the stand and use the easel?
>
> The court: You may. Go ahead.
>
> [State]: And actually I think I will, Your Honor, permission to actually remain probably next to the victim and hold up the microphone just to make sure that we hear her while she's describing things up at the easel?
>
> The court: Yes, the witness may have the microphone near her, yes.

Distura did not object to this reference by the prosecutor to "the victim." Nevertheless, at the next break, after hearing other objections, the court sua sponte admonished the prosecutor:

> The other thing, counsel, I need to warn you once more. Do not refer to her as the victim. You did it again at the top of the afternoon session. You asked in front of the jury, Your Honor, can the victim step down and come up to the board? Unless you want me to correct you on the record in front of the jury, which I don't think you want to and I don't want to do that, you need to stop. It needs to be the witness.

The prosecutor did not use the word "victim" in her closing argument. She used the words "alleged victim" twice in her rebuttal to the defense's closing argument.

Because Distura prevailed on his pretrial motion in limine, he did not have a standing objection. Thus, under Weber's "commonsense approach," he was required to object to the use of the word "victim" so the court could cure any prejudice. However, Distura argues that because the prosecutor deliberately disregarded the court's order, he was not required to contemporaneously object and that "prejudice is presumed" when "a prosecutor *deliberately* disregards a motion in limine ruling," citing Smith, 189 Wash. at 429. But Smith, a 1937 case, was decided before Weber, which considered

15

Smith and limited it, instead adopting the "commonsense approach" from Sullivan.

Weber, 159 Wn.2d at 271 ("the rule from Smith should apply only in limited

circumstances" involving "deliberate disregard" or where an objection "was likely more

damaging than almost any answer"). The State concedes the prosecutor's use of the

word "victim," particularly preceded by the word "my," as in "my victim," was error

because it violated the court's pretrial motion, yet contends this was not "a deliberate

snub of the court's ruling" but "mere *lapsus linguae.*"[7]

Because Distura did not object during voir dire or during the trial when the

prosecutor used the word "victim," he must establish that the "misconduct was so

flagrant and ill intentioned that an instruction could not have cured the resulting

prejudice." Emery, 174 Wn.2d at 760-61. The prosecutor used the term several times

during the first day of voir dire. She did not do so the second day of voir dire in front of

another panel. During trial, the prosecutor used the term only once. After referring to

M.D. as "the witness," the prosecutor asked the court's permission to "remain . . . next

to the victim and hold up the microphone." The court answered without repeating the

prohibited term: "Yes, the witness may have the microphone near her, yes." The

prosecutor did not use the term in her closing argument, and used the approved phrase

"alleged victim" only two times in her rebuttal.

This record does not show deliberate disregard, nor that " 'no curative instruction

would have obviated any prejudicial effect on the jury.' " Emery, 174 Wn.2d at 761

(quoting Thorgerson, 172 Wn.2d at 455). Rather, it shows the prosecutor listened and

responded to the court's sua sponte admonitions during voir dire and later during trial to

---

[7] Slip of the tongue. State v. Hujus, 73 Wn.2d 240, 243, 438 P.2d 212 (1968).

adhere to its pretrial order and, as a result, changed her word choice. This record does not demonstrate a " 'substantial likelihood' " that a single use of the prohibited term in discussing an administrative issue—the prosecutor asking permission to hold the microphone for the testifying witness—" 'affect[ed] the jury verdict.' " Id.

Finally, Distura argues that, even if prejudice is not presumed, "the prosecutor's repeated use of the word 'victim' cannot be held harmless" because M.D.'s credibility was the primary issue before the jury, pointing to cases from foreign jurisdictions holding that the word "victim" is prejudicial.[8] However, in the context of the entire case, the prosecutor used the precluded term only once during trial in the presence of the seated jury. All other instances of the prohibited term occurred during voir dire, before trial began. The prosecutor did not use the precluded term during closing. The court's instructions to the jury stated that the jurors were "the sole judges of the credibility of each witness" and that "the lawyers' statements are not evidence."[9] Distura made no objections to the prosecutor's use of the term "victim" and did not move for a mistrial on that basis.

While the prosecutor's use of the term "victim" violated the pretrial order, the record does not show that in doing so, she deliberately disregarded the court's order. Moreover, the trial court recognized the statements' impropriety and sua sponte provided curative admonishments to enforce its pretrial order. Distura did not object either to the prosecutor's use of the term during voir dire or to the single use of the word

---

[8] None of the cited cases are binding authority for this court. Jackson v. State, 600 A.2d 21, 25 (Del. 1991); State v. Mundon, 292 P.3d 205, 230 (Haw. 2012); State v. Sperou, 442 P.3d 581, 590 (Or. 2019); State v. Albino, 24 A.3d 602, 615 (Conn. 2011); State v. Devey, (2006 UT App, 138 P.3d 90, 95) . Even if considered for persuasive value, the cases do not help answer whether, in the context of Distura's trial, the prosecutor's use of the precluded word resulted in incurable prejudice or affected the jury's verdict.

[9] Jurors are presumed to follow the court's instructions. Emery, 174 Wn.2d at 766.

during trial. We agree with the State that this record fails to show a substantial likelihood that the error affected the jury's verdict.

### D. Comment on the evidence

Distura argues that the court's use of M.D.'s initials in its to-convict jury instructions for each charge "conveyed to the jury [that] the court believed [she] was a crime victim who needed protection." The State argues this court "should adhere to its prior decision[ ]" in State v. Mansour, 14 Wn. App. 2d 323, 330, 470 P.3d 543 (2020), review denied, 196 Wn.2d 1040 (2021). We agree with the State.

Article IV, section 16 of the Washington Constitution provides that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." "This constitutional provision prohibits a judge 'from conveying to the jury [their] personal attitudes toward the merits of the case' or instructing a jury that 'matters of fact have been established as a matter of law.' " Mansour, 14 Wn. App. 2d at 329 (internal quotation marks omitted) (quoting State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006)).

A claimed error alleging an improper judicial comment on the evidence may be raised for the first time on appeal. Levy, 156 Wn.2d at 719-20. "We review de novo whether a jury instruction constituted an improper comment on the evidence 'within the context of the jury instructions as a whole.' " Mansour, 14 Wn. App. 2d at 329 (quoting Levy, 156 Wn.2d at 721). We presume a comment on the evidence is prejudicial and the State bears the burden of showing no prejudice occurred. Levy, 156 Wn.2d at 725.

In Mansour, this court considered the same argument Distura makes here and held that the use of initials to identify a child victim in the to-convict instructions is not a

18

judicial comment on the evidence. 14 Wn. App. 2d at 330. In Mansour, we explained that the name of the victim of child molestation is not a factual issue requiring resolution, so the use of initials in the to-convict instruction "did not impermissibly instruct the jury that a matter of fact had been established as a matter of law." Id. at 329-30. Nor is a juror likely to presume that a complainant is a victim—or that the court considers them to be—merely because the court chooses to use their initials. Id. at 330. We observed that "even the court's use of the term 'victim' has 'ordinarily been held not to convey to the jury the court's personal opinion of the case.' " Id. (quoting State v. Alger, 31 Wn. App. 244, 249, 640 P.2d 44 (1982)).

Here, Distura nonetheless argues that Mansour was wrongly decided. He cites the same cases and makes arguments similar to those made by Mansour. The federal cases he cites are neither binding nor persuasive. All four are civil cases in which plaintiffs sought to use pseudonyms to conceal their identities throughout judicial proceedings.[10] By contrast, here, like the child victim in Mansour, M.D. was referred to by her full name throughout the trial. 14 Wn. App. 2d at 330.

State v. Jackman, also cited by Distura, is inapposite. 156 Wn.2d 736, 132 P.3d 136 (2006). In Jackman, the age of the victim was an element of the crime charged, communication with a minor for immoral purposes. 156 Wn.2d at 743. Thus, the victims' ages were a factual issue for the jury to resolve, and when the trial court included the victims' birth dates in the to-convict instructions, it conveyed to the jury that those dates

---

[10] Jane Doe v. Cabrera, 307 F.R.D. 1, 2 n.2 (D.D.C. 2014) (permitting use of a pseudonym throughout the pretrial process); James v. Jacobsen, 6 F.3d 233, 240-41 (4th Cir. 1993) (considering pseudonym use throughout trial for parents to protect identity of their minor children); Does I through XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1068 (9th Cir. 2000) (considering pseudonym use throughout pretrial proceedings); Jane Doe v. Rose, No. CV-15-07503-MWF-JCx, 2016 WL 9150620, at *1 (C.D. Cal. 2016) (order reserving for pretrial conference whether plaintiff would be permitted to use a pseudonym at trial).

had been proven true. Id. at 744. This was an impermissible judicial comment on the evidence because it allowed the jury to infer that the age element had been proved by the State. Id. The same is not true here because M.D.'s name is not an element of the crime of rape of a child in the first degree.

We agree with the State, follow Mansour, and conclude that the use of M.D.'s initials in the to-convict instructions did not convey anything to the jury about the judge's personal attitudes on the merits of the case and were not a judicial comment on the evidence.

II.      Conditions of community custody

Distura argues his sentence contains community custody conditions that must be stricken because they are either unconstitutional or unrelated to his crime.

 "Broadly speaking," community custody is authorized, and its conditions are governed, by the Sentencing Reform Act of 1981 (SRA).[11] State v. Hubbard, 1 Wn.3d 439, 446, 527 P.3d 1152 (2023). RCW 9.94A.703 specifies mandatory, waivable, discretionary, and special conditions that a court "shall impose" if a sentence includes community custody. Hubbard, 1 Wn.3d at 446. Certain sex offenses, like those for which the jury convicted Distura, require a court to sentence the offender to an indeterminate sentence and impose community custody "for any period of time the person is released from total confinement before the expiration of the maximum sentence." RCW 9.94A.507(5).

We review community custody conditions for an abuse of discretion. State v. Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018) (citing State v. Bahl, 164 Wn.2d

---

[11] Chapter 9.94A RCW.

739, 753, 193 P.3d 678 (2008) (citation omitted)). It is an abuse of discretion to impose a community custody condition in violation of the legal parameters set by RCW 9.94A.703 or to impose an unconstitutional condition. State v. Geyer, 19 Wn. App. 2d 321, 326, 496 P.3d 322 (2021). However, "[w]e will not overturn a community custody condition simply because we think the court should have acted differently," as the lawful exercise of discretion is a broad power. Id. at 326-27.

A. Home search consent conditions

"Probationers have a reduced expectation of privacy because they are 'persons whom a court has sentenced to confinement but who are serving their time outside the prison walls.' " State v. Olsen, 189 Wn.2d 118, 124-25, 399 P.3d 1141 (2017) (quoting State v. Jardinez, 184 Wn. App. 518, 523, 338 P.3d 292 (2014) (citation omitted)). Consequently, a person on probation is subject to searches founded upon a "reasonable suspicion" instead of a warrant supported by probable cause. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009); see also RCW 9.94A.631(1) ("reasonable cause"). But RCW 9.94A.631 "permits a warrantless search of the property of an individual on probation only where there is a nexus between the property searched and the alleged probation violation." State v. Cornwell, 190 Wn.2d 296, 306, 412 P.3d 1265 (2018).

Distura's sentence includes special community custody conditions relating to sex offenses. Distura challenges condition 8, which states:

8.   Consent to [Department of Corrections] home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which the offender lives or has exclusive/joint control/access.

Distura argues this condition is ripe for review and unconstitutionally overbroad because it requires his consent to random, suspicionless searches. The State argues Distura's challenge is not ripe. We agree with the State.

A claim is ripe for review on direct appeal " 'if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.' " State v. Sanchez Valencia, 169 Wn.2d 782, 786, 239 P.3d 1059 (2010) (internal quotation marks omitted) (quoting Bahl, 164 Wn.2d at 751)). " 'The court must also consider the hardship to the parties of withholding court consideration.' " Sanchez Valencia, 169 Wn.2d at 786 (internal quotation marks omitted) (quoting Bahl, 164 Wn.2d at 751)).

Distura argues condition 8 raises an issue that "is purely legal and does not require further factual development" because "condition 8 does not comport with . . . Cornwell." He argues the condition is final because his judgment and sentence is final, citing Hubbard, 1 Wn.3d at 452, and State v. Cates, 183 Wn.2d 531, 534, 354 P.3d 832 (2015). And he argues that a hardship will be worked against him if he waits to bring his challenge "only to find that Hubbard precludes his right to challenge it."[12]

In Cates, the court held that a challenge to a similar condition was primarily legal and a final action. 183 Wn.2d at 534. The court "thus consider[ed] only whether further factual development [wa]s required and the risk of hardship to Cates if [it] decline[d] to address the merits of his challenge at this time." Id. at 534-35. The court held that the challenge was not ripe because the "condition as written does not authorize any searches, and . . . the State's authority is limited to that needed 'to monitor [Cates's]

---

[12] Hubbard held that the one-year time bar on collateral attacks of a judgment and sentence applies to CrR 7.8 motions. 1 Wn.3d at 451.

compliance with supervision.' " Id. at 535 (citing RCW 9.94A.631).[13] Additionally, the Cates court decided that the risk of hardship to Cates was insufficient to justify review prior to such factual development because "[c]ompliance here does not require Cates to do, or refrain from doing, anything upon his release until the State requests and conducts a home visit." Id. at 536. Thus, the court held Cates's preenforcement challenge was not ripe and declined to review the merits. Id.

Distura argues that "this court should follow the lead of its recent unpublished cases and adjudicate the constitutionality of special condition 8."[14] But, as in Cates, while condition 8 at issue here is primarily a legal challenge and the challenged action is final, the issues require further factual development. Also, compliance with the condition does not require Distura immediately "to do, or refrain from doing, anything upon his release," id. at 536, so the risk of hardship to Distura is insufficient to justify review before such factual development. Thus, we follow Cates and hold that condition 8 is not ripe for review. See also State v. Holmes, __ Wn. App. 2d __, 548 P.3d 570, 584 (2024) (same condition not ripe for review under Cates).

---

[13] While Cates's challenge primarily concerned an oral comment by the sentencing court that was not incorporated into the written condition, the Supreme Court's analysis of the need for further factual development and the risk of hardship to Cates applies to the written condition there as well. The written condition in Cates was similar to condition 8 here and stated as follows: "You must consent to [Department of Corrections] home visits to monitor your compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which you live or have exclusive/joint control/access, to also include computers which you have access to." Cates, 183 Wn.2d at 533.

[14] Distura cites State v. Daniels, No. 54094-1-II (Wash. Ct. App. Aug. 3, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054094-1-II%20Unpublished%20Opinion.pdf and State v. Franck, No. 51994-1-II (Wash. Ct. App. Feb. 4, 2020) (unpublished) https://www.courts.wa.gov/opinions/pdf/D2%2051994-1-II%20Unpublished%20Opinion.pdf.

### B. Alcohol-related conditions

Distura's sentence also contains two conditions relating to the consumption of alcohol. Those conditions state:

9. Do not consume alcohol.
10. Be available for and submit to urinalysis and/or breathanalysis upon request of the [community custody officer] and/or chemical dependency treatment provider.

Distura argues that no evidence links drugs or alcohol to the crimes he committed so it was error for the court to impose these conditions. The State does not argue alcohol contributed to Distura's crime, but responds that RCW 9.94A.703(3)(e) does not require any specific connection to the crime of conviction and Distura does not claim a constitutional right to use drugs or alcohol.[15] We affirm both conditions 9 and 10.

RCW 9.94A.703(3) pertains to discretionary conditions that a court "may" order. While some of those conditions must be crime-related, some "need only have a more loose connection" to the crime of conviction, and some do "not require any specific connection" to the offender's crime. Geyer, 19 Wn. App. 2d at 325-26. In particular, RCW 9.94A.703(3)(e), "[r]efrain from possessing or consuming alcohol," does not require any connection to the crime of conviction. Geyer, 19 Wn. App. 2d at 326; see also State v. Jones, 118 Wn. App. 199, 206-07, 76 P.3d 258 (2003) (a court may impose the condition prohibiting consumption of alcohol regardless of connection to the crime). Consequently, we conclude that the court did not abuse its discretion by imposing condition 9 that prohibits Distura from consuming alcohol.

---

[15] Both parties refer to conditions relating to drug and alcohol use. However, here, the court did not impose any specific prohibition on controlled substances, though it had the authority to do. See RCW 9.94A.703(2)(c) (unless waived, "the court shall order an offender to . . . [r]efrain from possessing or consuming controlled substances").

While the State makes no argument for condition 10, which requires Distura to be available for urinalysis and/or breathanalysis, we conclude the court also acted within its discretion in imposing this condition. The trial court has the authority to impose testing to monitor and enforce compliance with a valid probation condition. See Olsen, 189 Wn.2d at 135 (rejecting constitutional challenge to community custody condition allowing random urinalysis testing); see also State v. Vant, 145 Wn. App. 592, 603-04, 186 P.3d 1149 (2008) (holding that the sentencing court has authority to impose random urinalysis and breathanalysis to monitor compliance with valid conditions). As condition 9 prohibiting the consumption of alcohol is valid, so too is condition 10, which allows monitoring for compliance with that condition.

### C. Sexual contact conditions

The court imposed condition 5 related to sexual contact by Distura:

5. Inform the supervising [community custody officer] and sexual deviancy treatment provider of any dating relationship. Disclose sex offender status prior to any sexual contact. Sexual contact in a relationship is prohibited until the treatment provider approves of such.

Distura argues this condition does not relate to his crime and infringes on his constitutional rights to speech, to marry, and to be intimate, so it must be stricken. While Distura lists constitutionally protected rights, he "disregards his status as a parolee with reduced rights," State v. Lee, 12 Wn. App. 2d 378, 403, 460 P.3d 701 (2020), and "[a]n offender's usual constitutional rights during community placement are subject to SRA-authorized infringements." State v. Hearn, 131 Wn. App. 601, 607, 128 P.3d 139 (2006) (citing State v. Ross, 129 Wn.2d 279, 287, 916 P.2d 405 (1996) (other citation omitted)).

We have previously addressed similar arguments and rejected them. See In re Pers. Restraint of Sickels, 14 Wn. App. 2d 51, 60, 469 P.3d 322 (2020). First, condition 5 is not a "crime-related prohibition" under RCW 9.94A.703(3)(f), as it does not prohibit conduct. Rather, because it requires affirmative conduct, it is governed by RCW 94.94A.703(3)(d), under which a court may order an offender to "otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community."

Distura reasons that he did not rape an adult, so there is no need for him to inform adults about his offender status. Similarly, Distura reasons there is no need for him to inform his community custody officer or therapist about a dating relationship because he did not "gain[ ] access to a child by dating a parent. Rather [his crimes] stemmed from a preexisting familial relationship." However, under RCW 94.94A.703(3)(d), condition 5 is reasonably related to the safety of children in the community in whatever way Distura may come into contact with them, including through a dating relationship. Sickels, 14 Wn. App. 2d at 60; see also State v. Autrey, 136 Wn. App. 460, 468, 150 P.3d 580 (2006) (rejecting argument that consensual sexual contact with an adult was unrelated to his crime of rape of a child because "potential [adult] romantic partners may be responsible for the safety of live-in or visiting minors."). We conclude condition 5 is not an abuse of the court's discretionary authority to order affirmative conduct reasonably related to the offender's offense, the risk of reoffending, or the safety of the community.

III.     VPA and DNA fee

Distura argues he was indigent when sentenced so the court should not have imposed the VPA or a DNA fee because of a recent amendment to the relevant statute. Under RCW 7.68.035(4), which became effective in July 2023, trial courts are required to waive the VPA if a defendant is indigent as defined in RCW 10.01.160(3). The same law eliminated the DNA fee entirely. LAWS OF 2023, ch. 449, § 4. This court has applied the VPA waiver to cases pending direct appeal when the law went into effect. See State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) (citing State v. Ramirez, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018)). Here, the court found Distura indigent the same day it sentenced him, and he timely appealed his conviction in December 2022. The State agrees that remand to strike the VPA and DNA fee is required, and we accept the State's concession.

Distura also argues his sentence contains a scrivener's error because the State requested that he obtain a sexual deviancy evaluation within 60 days, and a handwritten note on his sentence states the same, but a written condition conflicts and states "[w]ithin 30 days." The State has no objection, and we accept the concession.

CONCLUSION

We affirm Distura's convictions but remand to correct a scrivener's error and to strike the imposition of the VPA and a DNA collection fee.

Chung, J.

WE CONCUR:

Díaz, J.

Dwyer, J.