# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57260-5-II |
| Respondent, | |
| v. | |
| CHRISTOPHER LAMONT POSEY, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Christopher L. Posey appeals his convictions for one count of first degree burglary, one count of second degree rape, and one count of second degree assault committed against his ex-girlfriend S.K.[1]

During the trial, the prosecutor asked questions about a photo of Posey holding a gun and money. Posey argues that the State committed race-based prosecutorial misconduct by appealing to jurors' potential racial biases by questioning Posey about the photo. Posey also argues that he received ineffective assistance of counsel because his counsel failed to object to the State's questions about the photo.

Posey further argues that the use of S.K.'s initials in the jury instructions and special verdict form constituted an impermissible comment on the evidence by the trial court.

---

[1] After the incident, but before trial, the victim changed her last name. As a result, her initials were changed from S.F. to S.K. Our record refers to the victim with both last names interchangeably. However, because the victim expressed a preference to be referred to by her new last name, we use the initials S.K.

Posey next contends that he should be resentenced because his offender score included prior juvenile convictions which, following recent legislative amendments, should no longer be included.

Finally, with respect to his judgment and sentence, Posey challenges the trial court's imposition of two community custody conditions (condition 8—consent to home visits and condition 12—testing for drugs and alcohol) and requests that community custody supervision fees and the victim penalty assessment (VPA) be stricken.

We remand for the trial court to strike the community custody supervision fees and the VPA. Otherwise, we reject Posey's arguments and affirm his convictions.

FACTS

I. BACKGROUND

Posey and S.K. began dating in 2016. Within about a week of meeting, Posey recorded videos of the two having sex without S.K.'s consent. Soon, Posey moved into S.K.'s home. But in February 2018, S.K. ended the relationship and Posey moved out. Posey is a Black man and S.K. is a white woman.

About three months after Posey moved out, S.K. and a friend, Victor Garcia, were sleeping in S.K.'s home when Posey banged on the window, took off the window screen, and climbed through. According to S.K., over the next hour and a half, Posey dragged, slapped, strangled, and raped her.

While the rape was ongoing, law enforcement loudly knocked on the door and ordered them to "open up." 4 Verbatim Rep. of Proc. (VRP) at 573. Posey instructed S.K. to answer the door and tell law enforcement that he was not there. But when S.K. opened the door and law enforcement asked her whether Posey was there, S.K. nodded her head "yes." 4 VRP at 574.

S.K. then stepped outside and the door locked behind her. As law enforcement began searching the premises, a neighbor reported seeing someone run from the house.

While S.K. was still with law enforcement, Posey called her phone. She handed her phone to law enforcement. Talking with law enforcement on the phone, Posey admitted that he had just left S.K.'s home, but he insisted that he had done nothing wrong and that he would return with his attorney.

While at the scene, law enforcement observed that S.K.'s window screen was broken.

S.K. was taken to the hospital. Her injuries included abrasions, bruises, and handprints on her neck.

Several months later in January 2019, the State charged Posey with one count of first degree burglary with a special allegation of sexual motivation, one count of second degree rape, and one count of second degree assault—all alleged as crimes of domestic violence.

## II. MOTIONS IN LIMINE

After a long delay, the case proceeded to a jury trial in 2021. Before opening arguments, Posey moved in limine to exclude any prior bad acts evidence under ER 404(b), including Posey's prior juvenile convictions. The State agreed that Posey's prior juvenile convictions were not admissible but requested that the trial court reserve ruling on the admissibility of prior interactions between Posey and S.K.

The State referred to a time when Posey had allegedly sent S.K. a photo of himself holding what appeared to be a gun and displaying a large amount of money. The State further explained that Posey had represented to S.K. "on a number[] of occasions that . . . he want[ed] her to be a prostitute and work for him." 1 VRP at 62. The State contended that the nature of their relationship explained why S.K. behaved the why she did when Posey allegedly assaulted her. The State argued

3

that although propensity evidence is inappropriate, "things that are done to . . . cause a certain effect on the person . . . should be admissible under [ER] 404(b)." 1 VRP at 62-63.

Posey requested that the trial court reserve ruling on the issue until such evidence was offered and, if it was, that an offer of proof take place outside the presence of the jury.

The trial court agreed to reserve ruling on the admissibility of the evidence about Posey sending a photo to S.K. until more information was provided about the incident. The trial court stated,

> Yeah. I think at this point it's appropriate. I will . . . reserve a ruling on that until such time there[ is] more information to be provided, and then we can, again, handle that outside the presence of the jury.

1 VRP at 63.

The case proceeded to jury selection and opening statements.

III. TRIAL TESTIMONY

Following opening statements, the State began its case. An emergency room nurse, four law enforcement officers, and S.K. testified consistently with the facts set forth above.

S.K. testified at length about the assault. She explained that after Posey climbed through her window, Posey grabbed her by the hair, pulled her to the ground, and threw her into a bedroom dresser. Posey told Garcia (who was in the room) to give him his phone and money, and demanded that Garcia strip down to his underwear. When S.K. yelled at Posey to leave, he told her that she was a "stupid b[*]tch." 4 VRP at 560. Posey slapped S.K. on the right side of her face three or four times. Eventually, Posey made Garcia leave the house.

Now alone with S.K., Posey began to strangle her. After a few moments, Posey let go of S.K.'s neck and began dragging S.K. to the kitchen. S.K. tried to run towards the kitchen hoping to use some of the knives for protection, but Posey caught her by the hair and started strangling

4

her again.  S.K. was able to make it to the back door and screamed for help.  S.K. managed to get out of the house and ran into the street.  But Posey chased after her, caught her, and dragged her back into the house by her hair.

S.K.'s testimony then turned to the rape.  She explained that once Posey dragged her back into the house, he threw her on the couch and asked her whether she had "been with anybody" since they were last together.  4 VRP at 571.  Posey lifted up S.K.'s shirt and checked her for "hickies because he thought [she] was with [Garcia]."  4 VRP at 595.

S.K. then noticed a shift in Posey's demeanor, going from angry to quiet and blank.  Terrified and hoping to end the attack, S.K. told Posey that she loved him and pleaded with him to not hurt her.  Posey then asked S.K., "[W]ell, if you really love me why aren't you with me?"  4 VRP at 572.  S.K. told Posey that he had done "too much to [her] in the past."  4 VRP at 572.  Posey then said, "[L]et's have sex."  4 VRP at 572.  S.K. said no, but Posey pulled down her pants anyway.  S.K. kept telling Posey, "[N]o" and tried to "cross [her] legs," but Posey "kept pulling them open."  4 VRP at 572.  Posey then proceeded to rape S.K. with his fingers while she pleaded with him to stop.

After describing the assault and rape, S.K. also explained how one of Posey's friends had messaged S.K. on social media and offered her $5,000 to drop the charges against Posey.  S.K. rejected the offer.

During cross-examination, defense counsel asked S.K. whether she had sent Posey sex videos.  S.K. denied that she had ever made videos of them having sex, but she said that Posey had.  S.K. said that Posey had recorded those videos about one week after the two had met.  S.K. denied that she gave Posey permission to record the sex videos.

Defense counsel also questioned S.K. about several exhibits that appeared to be social media messages sent by S.K. to Posey after the State had filed charges against Posey. In the exhibits, S.K. purportedly used racial slurs to refer to Posey and insinuated that she had made up the allegations to extort money from him. In one of the exhibits, S.K. also purportedly told Posey that her allegations would be believed because she was white and Posey was Black. S.K. denied writing the messages in the exhibits.

The defense then began its case. Posey testified in his own defense and offered a very different account of what happened. Posey denied committing the burglary, assault, and rape. According to Posey, S.K. invited him to her house on the day of the incident. Posey stated that he and S.K. had an "on and off" relationship and on the day of the incident, the relationship was "[o]n." 6 VRP at 705, 731.

When he arrived, Posey claimed that he encountered another man leaving the house. Posey knocked on the door and S.K. answered. Posey said that he did not "necessarily see the condition that [S.K.] was in" when he arrived, but he later noticed a bruise on her eye. 6 VRP at 707-08. He asked her about how that happened, and she said that it did not matter because they were not together anymore. Posey accepted S.K.'s response because it was "none of [his] business" and "[s]he does what she does. I do what I do." 6 VRP at 738.

Posey claimed he ran away from law enforcement because he thought the officers were actually S.K.'s cousin (who Posey claimed had threatened to harm him over a debt). And when he spoke to law enforcement on the phone shortly after the incident, Posey claimed that he thought that S.K.'s cousin was impersonating a law enforcement officer.

Posey testified that he received, from S.K., the social media messages that both used racial slurs and insinuated the allegations were false as an attempt to extort money from him.

Posey also testified about the videos that depicted S.K. and him having sex. In contrast to S.K.'s testimony, Posey claimed these videos were made with her permission *after* the alleged incident, and not two years before.

During Posey's cross-examination, the State asked whether Posey had ever tried to intimidate S.K. Posey responded, "No." 6 VRP at 753. Then, after asking several questions about a photo of S.K.'s bedroom, the State turned to a proposed exhibit of a photo of Posey holding what appeared to be a gun and money. Posey explained that the photo was taken at a music-video shoot and that the gun and money in the photo were not real; they were props for the music video. The State also asked about the theme of the music video, and Posey responded that it was "hip hop rap." 6 VRP at 755. The entire exchange encompassed the following:

[State]: . . . Showing what's been marked as 25. Who is that in that picture?

[Posey]: That's me.

[State]: Who took that picture?

[Posey]: [S.K. took the photo.] That's at my brother's music video shoot.

[State]: Okay. So explain to me what happened in this photograph, what the deal is.

[Posey]: I was a stand-in and then that's me holding money and a weapons prop.

[State]: It's a weapons prop?

[Posey]: Yes.

[State]: And [S.K.] took that?

[Posey]: Yes, she was there.

[State]: And she took it at your request?

[Posey]: Yeah.

[State]: And when did that happen?

[Posey]: 2016 . . . end of 2016 beginning of 2017.

[State]: So when you-all were together. You and—you-all being you and [S.K.]?

[Posey]: Yeah.

[State]: And she took that at your request?

[Posey]: Yeah.

[State]: And you—that was not a real pistol in your hand?

[Posey]: No.

[State]: Was it real money?

[Posey]: No, it's prop money.

[State]: Okay. So it's prop money and it's—the idea is that it's going to—what's—what's the theme of the music video?

[Posey]: Just like hip hop rap.

[State]: Okay.

6 VRP at 754-55.

Following this exchange, the State offered the exhibit for admission into evidence. Posey objected, arguing that it was irrelevant since the photo was from 2016. The State responded that testimony from 2016 had been elicited throughout the trial. The trial court overruled Posey's objection and admitted the exhibit. The exhibit was never shown to the jury.

The following day, the State apparently changed its mind about the exhibit. While outside the presence of the jury, the State expressed second thoughts about having the exhibit in evidence and offered to have it withdrawn. The State said that it did not intend to mention the exhibit again during testimony or in closing argument. The following exchange occurred:

> [Prosecutor]: So overnight I rethought offering 25 which is the photograph of Mr. Posey holding a pistol and some money. That was perhaps overly aggressive on my part. I asked him if he ever tried to intimidate and he said, No. There are other things I could have done that would have been less drastic, quite frankly. So I'm —I'm just trying to be frank with the [c]ourt. If counsel wants that withdrawn—
>
> [Defense counsel]: We do.
>
> [Prosecutor]: So—yeah, I don't intend to mention it in closing either way. He provided an explanation. I wasn't going to ask anybody else to follow up on anything. But if he wants it withdrawn, I don't have an issue with that. I think it was a mistake on my part. I was kind of in full mode there and—and having a chance to reflect overnight, I think that's the right answer.

7 VRP at 846-47.

The trial court withdrew the exhibit from evidence. The State then asked whether there needed to be some comment about the exhibit or whether it should just be ignored. Defense counsel responded he did not "need for it to be discussed." 7 VRP at 847. As a result, the trial court did not further mention the exhibit and the exhibit was not mentioned again at trial.

IV. JURY INSTRUCTIONS

Following the completion of testimony, the case proceeded to jury instructions. Throughout the trial, S.K. was referred to by her first name and last name. However, several of the to-convict jury instructions and one of the special verdict forms referred to S.K. only by her initials. Posey did not object to the to-convict instructions or the special verdict form.

V. VERDICT, SENTENCE, COMMUNITY CUSTODY CONDITIONS, AND APPEAL

The jury found Posey guilty as charged, except that it rejected the allegation that the burglary was sexually motivated.

The trial court sentenced Posey to an indeterminate sentence of 136 months to life for the second degree rape conviction, 75 months for the first degree burglary conviction, and 17 months for the second degree assault conviction, all to be served concurrently. Three of Posey's prior juvenile convictions were included in his offender score.

The trial court also imposed 18 months of community custody on the first degree burglary and second degree assault convictions, and community custody for life on the second degree rape conviction. As part of his community custody, the trial court imposed numerous conditions, including the following:

> 3. Not possess or consume controlled substances except pursuant to lawfully issued prescriptions[.]
>
> . . . .

8. Consent to DOC [Department of Corrections] home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of [the] residence in which the offender lives or has exclusive/joint control/access.

. . . .

11. Do not use or consume alcohol and/or Marijuana.

12. Be available for and submit to urinalysis and/or breath[]analysis upon the request of the CCO [community corrections officer] and/or the chemical dependency treatment provider.

Clerk's Papers (CP) at 162-63.

The trial court also found Posey indigent but imposed a $500 VPA. Community custody supervision fees were struck from one portion of the judgement and sentence but imposed in another portion.

Posey appeals.

ANALYSIS

Posey makes the following arguments: (1) the State committed race-based misconduct by appealing to jurors' potential racial biases when it asked questions about the photo showing Posey with the gun and money, (2) he received ineffective assistance of counsel related to his counsel's failure to object to these questions, (3) the trial court impermissibly commented on the evidence when it used S.K.'s initials in the to-convict jury instructions and special verdict form, (4) he should be resentenced because recent changes to the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, mean his offender score should not include his previous juvenile convictions, (5) the trial court erred by imposing two of his community custody conditions, and (6) community custody supervision fees and the VPA should be stricken from his judgment and sentence.

Each argument will be addressed in turn.

10

I. RACE-BASED PROSECUTORIAL MISCONDUCT

Posey argues that the State committed race-based prosecutorial misconduct when it questioned Posey about the photo that depicted him holding a gun and money. While acknowledging the importance of this issue, we disagree.

A. LEGAL PRINCIPLES

Allegations of race-based prosecutorial misconduct are deeply concerning because "[i]f justice is not equal for all, it is not justice." *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011). It is particularly damaging when the prosecutor, as a representative of the State, introduces racial discrimination or bias into the jury system. *State v. Zamora*, 199 Wn.2d 698, 710, 512 P.3d 512 (2022). A prosecutor has a duty to ensure that a defendant's constitutional rights to a fair trial are not violated. *Id.* When a prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions, a prosecutor gravely violates a defendant's right to an impartial jury. *Monday*, 171 Wn.2d at 676. Allowing racial bias to infringe upon the jury system at any stage of a criminal proceeding damages the jury's role as a pivotal check against wrongful State action. *Zamora*, 199 Wn.2d at 711.

When allegations of prosecutorial misconduct implicate racial bias, we apply a separate test that is distinct from the test for prosecutorial misconduct allegations not involving racial bias. *Id.* at 709. A separate test is applied because such bias in the justice system undermines the principle of equal justice and is repugnant to the concept of an impartial trial. *Id.* We reverse a defendant's conviction when a prosecutor " 'flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence' . . . ." *Id.* (quoting *Monday*, 171 Wn.2d at 680). Defense counsel's failure to object is irrelevant to claims of race-based prosecutorial misconduct because a defendant's right to a fair trial cannot be waived.

*Id.* at 717. Once a court has concluded that a prosecutor's conduct flagrantly or apparently intentionally appealed to jurors' racial bias, it cannot be cured and is per se prejudicial. *State v. Bagby*, 200 Wn.2d 777, 803, 522 P.3d 982 (2023) (lead opinion of Montoya-Lewis, J.); *id.* at 804-805, (Stephens, J., concurring); *Zamora* 199 Wn.2d at 722.

But not all references to race are improper. *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 834, 408 P.3d 675 (2018). The issue of whether a prosecutor flagrantly or apparently intentionally appealed to jurors' racial bias is analyzed objectively. *Zamora,* 199 Wn.2d at 716. Thus, we determine whether an objective observer could view the prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence. *Id.* at 718.

An "objective observer" is an individual "who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination." *Id.* With this objective observer standard, we consider the four *Bagby* factors: (1) the content and subject of the statements, (2) the frequency of the remarks, (3) the apparent purpose of the statements, and (4) whether the comments were based on evidence or reasonable inferences in the record. 200 Wn.2d at 793.

B. APPLICATION

Posey argues that the State "flagrantly or apparently intentionally" appealed to the jurors' potential implicit bias against Black men by asking Posey about the photo that showed him holding a fake gun and money. Posey contends that the content and subject matter of the questions showed that the State was evoking the racist stereotype that Black men are dangerous. Even though the photo was not seen by the jury, Posey argues that specific questions were intentionally provocative of these stereotypes, including asking whether Posey was holding "a real pistol," whether Posey

was holding "real money," and about the theme of the music video. Br. of Appellant at 31 (emphasis omitted). These questions, according to Posey, all built the image of Posey in the minds of the jurors of a young Black man who "flaunts money and values violence." Br. of Appellant at 40. Posey argues that the purpose to appeal to the implicit racial biases is apparent because there was no other relevant purpose for the photo.[2]

We begin our analysis with the four *Bagby* factors.

With *Bagby*'s first factor, the content and subject matter of the questions, Posey has his strongest argument. Although the State's questions did not specifically mention race or ethnicity, the questions were about an actual photo of Posey, a young Black man, holding what appeared to be a gun and money. The photo itself was not shown to the jury, but the State's questions, asking whether Posey had a "real pistol" in his hand and "real money," and soliciting that the theme of the music video was "hip hop rap," elicited responses that likely painted an accurate picture for the jury of what the photo depicted. 6 VRP at 755. Viewing this first *Bagby* factor in isolation, the questioning could have evoked images consistent with the harmful stereotype that young Black men are dangerous. Posey's concern about these themes has merit.

---

[2] At oral argument before this court, the State argued that the questions about the photo should not be analyzed under the race-based prosecutorial misconduct framework because "the prosecutor made no reference of race" in their questions about the photo. Wash. Ct. of Appeals oral arg., *State v. Posey*, No. 57260-5-II (Sept. 4, 2024), at 13 min., 49 sec. through 13 min., 52 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-2-court-of-appeals-2024091156/?eventID=2024091156.

We reject the contention that an explicit "reference of race" is necessary before there can be a claim for race-based prosecutorial misconduct. *Zamora*, 199 Wn.2d at 714-15 ("Courts must be vigilant of conduct that appears to appeal to racial or ethnic bias even when not expressly referencing race or ethnicity, . . . . subtle references to racial bias are 'just as insidious' and '[p]erhaps more effective.' " (second alteration in original) (quoting *Monday*, 171 Wn.2d at 678)).

But *Bagby* instructs that we do not stop our analysis at this first factor. *See* 200 Wn.2d at 796-99. The second, third, and fourth factors from *Bagby* require an analysis of "the frequency of the remarks, the apparent purpose of the statements, and whether the comments were based on evidence or reasonable inferences." *Id.* at 793. This is where Posey's argument fails.

With respect to the second *Bagby* factor, the remarks were not voluminous and were not repeated. The State asked Posey 12 questions about the photo, which constituted one and a half pages of testimony in a multiday trial that included nearly 500 pages of testimony. Of those 12 questions, only 5 referenced or elicited testimony about guns, money, or hip hop music. And Posey's responses to the questions explained the benign origin of the photo—that it was taken by S.K. at a music-video shoot—further minimizing the questioning's impact. Moreover, the State did not reference the photo or Posey's responses at any other point during the trial. Considering that the trial involved 5 days of testimony with multiple witnesses, the arguable references to race and ethnicity were minor and few in number.

With respect to the third *Bagby* factor, the apparent purpose of the questions appeared to be unrelated to provoking racial stereotypes. The State had preceded the questioning about the photo by asking Posey whether he had ever attempted to "intimidate" S.K. to which Posey answered, "No." 6 VRP at 752-53. With questions about the photo coming in such close proximity to that denial by Posey, the apparent purpose was impeachment—that is, that the State was trying to show that Posey had actually attempted to intimidate S.K. by sending her a photo of himself holding a gun.

And as for the fourth *Bagby* factor, the State's questions were clearly tied concretely to evidence. The State's remarks were not arguments untethered to potential evidence; rather, they

were questions literally about an actual photo of Posey. There were no argumentative assertions or rhetorical appeals tied to the photo, and the photo was never referenced by either party again.

As instructed by our Supreme Court, we must endeavor to eradicate racial bias from the legal system. Posey alleges that such racial bias infected his trial and he argues persuasively that the issues potentially raised by the photo deserve careful consideration. However, when all the circumstances are viewed collectively within the framework of the four *Bagby* factors, we conclude that an objective observer could not view the prosecutor's questions and comments as a flagrantly or apparently intentionally appeal to potential racial prejudice, bias, or stereotypes in a manner that undermined Posey's credibility or the presumption of innocence. Therefore, we hold that the State did not commit race-based prosecutorial misconduct.[3]

---

[3] Separate from his race-based prosecutorial misconduct argument, Posey also appears to be possibly arguing that the State committed prosecutorial misconduct by violating the trial court's motion in limine ruling that any prior bad acts evidence would first need to be heard outside the jury's presence. If Posey is making this as a separate argument, we disagree.

This argument appears to be about a procedural violation—that the State disregarded the trial court's motion in limine ruling. In a non-race-based prosecutorial misconduct claim, if the defendant fails to object to the State's remarks at trial, any error regarding prosecutorial misconduct is deemed to have been waived unless the misconduct was "so flagrant and ill intentioned that [a jury] instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

Here, Posey did not object when the State did not make an offer of proof outside the presence of the jury about the photograph, which means he must make the higher showing of "so flagrant and ill intentioned that [a jury] instruction could not have cured the resulting prejudice." *Id.* But Posey provides no analysis of the application of these standards for non-race-based prosecutorial misconduct. Thus, to the extent Posey is attempting to make this argument (separately from his race-based misconduct argument), we do not further consider it. *State v. Elliott*, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) (court need not consider claims that are insufficiently argued).

II. INEFFECTIVE ASSISTANCE OF COUNSEL

Related to the same photo showing him holding a gun, Posey argues that he received ineffective assistance of counsel based on his counsel's failure to object to the prosecutor's questions about the photo. We disagree.

To show ineffective assistance of counsel, the defendant must demonstrate (1) that their counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

To show prejudice—the second prong of the *Strickland* test—the defendant must demonstrate a reasonable probability that the outcome of the proceeding would have been different if counsel had not performed deficiently. *See State v. Bertrand*, 3 Wn.3d 116, 129, 546 P.3d 1020 (2024).

Here, Posey contends he can meet the requirement for prejudice because the case largely came down to making credibility determinations about S.K. and Posey. He asserts that the State's questions about the photo led the jury to find that Posey's testimony was not credible based on implicit racial bias. But for that illegitimate damage to his credibility, Posey argues the jury would have found reasonable doubt.

Posey's attempt to demonstrate prejudice is unpersuasive. The questioning about the photo was minor in the context of the entire trial. As discussed above, the questioning was merely 12 questions in the course of a multiday trial with multiple witnesses, and Posey's answers to these few questions provided a benign explanation which would have softened any effect it may have otherwise had. In addition, the photo was never shown to the jury nor was it ever referenced again

16

by either party. Although Posey's concern about implicit bias has merit, under these narrow circumstances, Posey cannot show a reasonable probability that the outcome of the proceeding would have been different. Because Posey cannot demonstrate prejudice, his ineffective assistance of counsel claim fails.

## III. COMMENT ON THE EVIDENCE

Posey argues that when S.K.'s initials were used in the to-convict jury instructions and the special verdict form, the trial court made an impermissible comment on the evidence. The State argues that the use of S.K.'s initials did not amount to a judicial comment on the evidence. We agree with the State.[4]

## A. LEGAL PRINCIPLES

The purpose of prohibiting judicial comments on the evidence "is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted." *State v. Elmore*, 139 Wn.2d 250, 275, 985 P.2d 289 (1999). Article IV, section 16 of our state's constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." This provision prohibits a judge "from expressing to the jury his or her personal attitudes regarding the merits of the case or instructing the jury that issues of fact have been established as a matter of law." *State v. Gouley*, 19 Wn. App. 2d 185, 197, 494 P.3d 458 (2021), *review denied*, 198 Wn.2d 1041 (2022). The critical inquiry underlying

---

[4] The State also argues that Posey failed to preserve this argument by not objecting below. However, a judicial comment on the evidence is generally an error of constitutional magnitude that a defendant may raise for the first time on appeal. *State v. Levy*, 156 Wn.2d 709, 719-720, 132 P.3d 1076 (2006).

our analysis is whether the mention of a fact in a jury instruction "conveys the idea that the fact has been accepted by the court as true." *State v. Levy*, 156 Wn.2d 709, 726, 132 P.3d 1076 (2006).

We review de novo whether a jury instruction amounts to a judicial comment on the evidence in the context of the instructions as a whole. *Id.* at 721.

B.  APPLICATION

Posey's argument that the trial court impermissibly commented on the evidence is rooted in his assertion that the use of initials, by itself, communicates to the jury that the trial court has prejudged the case—that the trial court has already decided that S.K. *is* a credible victim, not just an *alleged* victim.

Posey exaggerates the effects of initials.  In *State v. Mansour*, the defendant challenged his child molestation conviction, arguing, like Posey, that using the victim's initials "A.M." instead of the person's name constituted a judicial comment on the evidence.  14 Wn. App. 2d 323, 328-29, 470 P.3d 543 (2020), *review denied*, 196 Wn.2d 1040 (2021).  Division One disagreed, reasoning that the name of the victim was not a factual issue requiring resolution.  *Id.* at 329. Division One also rejected the argument that initials conveyed anything about the merits of the allegations, explaining,

> [A] juror would likely not presume that A.M. was a victim—or believe the court considered her one—merely because the court chose to use A.M.'s initials.  Indeed, we have observed that even the court's use of the term "victim" has "ordinarily been held not to convey to the jury the court's personal opinion of the case." Therefore, we are unpersuaded that the use of A.M.'s initials in the to-convict instruction conveyed anything to the jury about the judge's "personal attitudes toward the merits of the case," much less that the judge considered A.M. a victim.

*Id*. at 330 (internal quotation marks omitted) (quoting, *State v. Alger*, 31 Wn. App. 244, 249, 640 P.2d 44 (1982); *Levy*, 156 Wn.2d at 721).

Posey contends *Mansour* was wrongly decided, but we are persuaded by Division One's reasoning. Like in *Mansour*, S.K.'s name was not a factual issue requiring resolution, and a juror would likely not presume that use of the initials, by itself, was conveying the trial court's personal opinion of the merits of the case. Thus, we hold that the use of S.K.'s initials in the to-convict instructions and the special verdict form did not constitute a judicial comment on the evidence.

## IV. OFFENDER SCORE

Posey argues that we should remand for resentencing because recent changes to RCW 9.94A.525(1)(b) mean his offender score should not include his previous juvenile convictions. We disagree.

### A. STANDARD OF REVIEW

Statutory interpretation is a question of law that we review de novo. *Lakeside Indus., Inc. v. Dep't of Revenue*, 1 Wn.3d 150, 155, 524 P.3d 639 (2023). The goal of statutory interpretation is to carry out the legislature's intent. *Leishman v. Ogden Murphy Wallace, PLLC*, 196 Wn.2d 898, 904, 479 P.3d 688 (2021). We must give effect to the plain meaning of a statute as an expression of legislative intent where possible. *Id.* If the plain language of the statute is unambiguous, our inquiry is over. *Id.*

### B. CHANGE IN THE LAW REGARDING JUVENILE CONVICTIONS

When the trial court sentenced Posey, it included his prior juvenile convictions in his offender score. At the time Posey was convicted and sentenced, this was consistent with the SRA because former RCW 9.94A.525 (2017) provided that prior juvenile convictions were included in a defendant's offender score.

But in 2023, after Posey was sentenced, the legislature amended RCW 9.94A.525 to remove, in most situations, juvenile convictions from offender scores. RCW 9.94A.525(1)(b). This amendment became effective on July 23, 2023. LAWS OF 2023, ch. 415, § 2.

Whether this amendment should be applied to Posey while his case is on appeal depends on whether this amendment applies to crimes committed only after its effective date or whether it also applies to pending cases that are not final.

Because determining the appropriate legal punishments for criminal offenses is generally a legislative function, not a judiciary function, sentences are generally imposed in accordance with the law in effect at the time of the offense. *State v. Tester*, 30 Wn. App. 2d 650, 655, 546 P.3d 94 (2024). This principle can be seen in both the "timing statute" and the "savings clause statute." *Id.* at 654; *State v. Dean*, 113 Wn. App. 691, 695, 54 P.3d 243 (2002) (referring to RCW 9.94A.345 as "timing statute"), *review denied*, 149 Wn.2d 1009 (2003).

The timing statute provides that, in general, when sentencing a defendant, the applicable law is the law in effect at the time the offense was committed; it states:

> Except as otherwise provided in [the SRA], any sentence imposed under this chapter shall be determined in accordance with the law in effect *when the current offense was committed*.

RCW 9.94A.345 (emphasis added).

Similarly, the savings clause statute provides that even if a criminal statute has been amended after a criminal act, the version of the statute effective at the time of the act is applied, unless a "contrary intention" is explicitly declared in the amendment; it states:

> Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, *unless a contrary intention is expressly declared in the amendatory* or repealing *act*, and every such amendatory or repealing statute shall be so construed

as to save all criminal and penal proceedings, and proceedings to recover forfeitures, pending at the time of its enactment, unless a contrary intention is expressly declared therein.

RCW 10.01.040 (emphasis added).

C. APPLICATION

Posey argues that the amendment to RCW 9.94A.525 applies to his case on appeal such that he should be resentenced without the inclusion of his juvenile convictions in his offender score. He contends that the timing statute and the savings clause statute do not apply because the plain language of the amendment " 'fairly convey[s]' " its intention to apply to pending cases that are not final. Br. of Appellant at 62 (quoting *State v. Jenks*, 197 Wn.2d 708, 720, 487 P.3d 482 (2021)). Posey points to language from the amendment stating that the legislature intended to facilitate rehabilitation, reintegration, and due process, and to recognize the research on juvenile brains and the disproportionate impact of juvenile convictions on adult sentences. Unless the amendment is applied to pending cases, Posey argues that "the law will not remedy the injustice it was aimed at remedying." Br. of Appellant at 63. Posey also argues that the amendment is remedial, and " '[r]emedial statutes are generally enforced as soon as they are effective, even if they relate to transactions predating their enactment.' " Br. of Appellant at 64 (quoting *State v. Pillatos*, 159 Wn.2d 459, 473, 150 P.3d 1130 (2007)). We disagree.

Recent cases have addressed and rejected these same arguments about the amendment to RCW 9.94A.525(1). *Tester*, 30 Wn. App. 2d at 657-59; *State v. Troutman*, 30 Wn. App. 2d 592, 594, 546 P.3d 458 (2024). In *Troutman*, the defendant argued that the amendment to RCW 9.94A.525(1) applied to her case pending appeal by pointing to the same language as Posey in the intent section and asserting that it expressed a legislative intent that the amendment should apply to pending cases on appeal. 30 Wn. App. 2d at 599. Division One rejected the defendant's

21

argument, reasoning that the plain language of the intent section of the statute "says nothing about retroactivity." *Id.*

Similarly, in *Tester*, this court addressed the argument that RCW 9.94A.525(1)(b) is a remedial statute that should be applied to a case on appeal. 30 Wn. App. 2d at 658-59. There, the defendant argued, like Posey, that RCW 9.94A.525(1)(b) is a remedial statute because it involved a procedural change. *Id.* at 658. In rejecting this argument, this court noted that " 'changes to criminal punishments are substantive, not procedural,' " and regardless, whether an amendment is remedial is irrelevant when the law is subject to the savings clause statute. *Id.* at 658-59 (quoting *Jenks*, 197 Wn.2d at 721).

Here, Posey makes the same arguments as the defendants in *Troutman* and *Tester*. And we see no basis to depart from the rationale of either case. The intent provision of the amendments does not mention retroactivity or express a "contrary intention" from the application of the savings clause statute and, therefore, does not show that the legislature intended for the law to apply to pending cases. *Tester*, 30 Wn. App. 2d at 655; *Troutman*, 30 Wn. App. 2d at 599-600. And the amendment constituted a substantive change to criminal punishment, not a procedural change. *Tester*, 30 Wn. App. 2d at 658.

We conclude, like the *Tester* and *Troutman* courts, that the legislature did not express an intent to avoid the application of the savings clause statute when it amended RCW 9.94A.525(1). Thus, because the savings clause statute applies, we hold that Posey is not entitled to be resentenced with the benefit of this amendment.

V. COMMUNITY CUSTODY CONDITIONS

Posey argues that two of his community custody conditions must be stricken. First, Posey argues that condition 8, requiring that he consent to searches of his home, is unconstitutionally

overbroad in violation of article I, section 7 of the Washington Constitution. Second, Posey

contends that condition 12, requiring Posey to submit to breath and urine tests, must be stricken

because it is not crime related.

We disagree.

## A. CONDITION 8: CONSENT TO HOME VISITS

Posey contends that community custody condition 8 is overbroad and violates his

constitutional right not to have his private affairs disturbed without authority of law. Condition 8

provides:

> 8. Consent to DOC home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of [the] residence in which the offender lives or has exclusive/joint control/access.

CP at 162.

Posey argues that for a search like this to be constitutional, a CCO must have reasonable

cause to believe the supervised person has violated a condition or requirement of the sentence and

there must be a nexus between the property sought to be searched and the alleged violation.

The State claims that Posey's challenge to this condition is not ripe for review, citing *State

v. Cates*, 183 Wn.2d 531, 354 P.3d 832 (2015). We agree.

A preenforcement challenge to a community custody condition is ripe for review if " 'the

issues raised are primarily legal, do not require further factual development, and the challenged

action is final.' " *Id.* at 534 (internal quotation marks omitted) (quoting *State v. Sanchez Valencia*,

169 Wn.2d 782, 786, 239 P.3d 1059 (2010)). "[W]e must consider the hardship to the [defendant]

if we refused to review [the] challenge on direct appeal." *Sanchez Valencia*, 169 Wn.2d at 789.

In *Cates*, the defendant was convicted of sexual assault crimes. 183 Wn.2d at 533. On

appeal, the defendant challenged a condition of community custody, which read, "You must

23

consent to [DOC] home visits to monitor your compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which you live or have exclusive/joint control/access, to also include computers which you have access to." *Id.* (internal quotation marks omitted).

Our Supreme Court declined to decide the merits of the case because it determined the issue was not ripe. *Id.* at 536. The court reasoned that "[t]he condition as written [did] not authorize any searches . . . ." and that the risk of hardship to the defendant was insufficient. *Id.* at 535-36. Distinguishing other cases involving conditions that imposed requirements on defendants immediately upon release from prison, the *Cates* court emphasized that complying with the particular condition did not require the defendant to do, or refrain from doing, anything upon his release *until* the State actually conducted a home visit. *Id.* at 536. Accordingly, the court concluded that the defendant would not suffer hardship if it declined to review the merits of the defendant's argument. *Id.*

Here, Posey argues we should not follow *Cates*, but offers no persuasive explanation of how his condition is different from the condition discussed in *Cates*. Thus, we are compelled to follow *Cates* and conclude that the issue is not ripe for review.

B. CONDITION 12: BREATH AND URINE TESTING CONDITION

Posey next challenges condition 12, which reads as follows:

12. Be available for and submit to urinalysis and/or breath[]analysis upon the request of the CCO and/or the chemical dependency treatment provider.

CP at 163.

Posey argues that this condition must be stricken because it is not crime related. The State concedes the issue and agrees with Posey that condition 12 should be stricken because neither drugs or alcohol were alleged to have contributed to the offenses.

We do not accept the State's concession. *See State v. Lewis*, 62 Wn. App. 350, 351, 814 P.2d 232, *review denied*, 118 Wn.2d 1003 (1991) (court not bound to accept erroneous State concession). The challenged condition did not need to be crime related—it is a permissible condition to enforce community custody conditions 3 and 11, which prohibit the consumption of drugs and alcohol.

The sentencing court may impose crime-related conditions. Under the SRA, "the court may order an offender to . . . [c]omply with any crime-related prohibitions" in its discretion "[a]s part of any term of community custody." RCW 9.94A.703(3)(f); *see also* RCW 9.94A.505(9) (granting the court authority to impose crime-related conditions "[a]s a part of any sentence").

But there are a limited number of community custody conditions that the trial court can impose regardless of their connection to the crime, including prohibiting the use of drugs or alcohol. RCW 9.94A.703(2)(c) ("Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [r]efrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions."); RCW 9.94A.703(3)(e) ("As part of any term of community custody, the court may order an offender to . . . [r]efrain from possessing or consuming alcohol."); *State v. Jones*, 118 Wn. App. 199, 207, 76 P.3d 258 (2003) (trial court is permitted to prohibit consumption of alcohol regardless of connection to the crime).

If these prohibitions are ordered, the trial court has the authority to impose testing to enforce compliance with them. *See State v. Vant*, 145 Wn. App. 592, 603-04, 186 P.3d 1149 (2008) (holding that the sentencing court has authority to impose random urinalysis and breath

analysis to monitor compliance with valid conditions).  This includes imposing breath and urine testing.  *See id.*

Here, in two separate community custody conditions, the trial court imposed prohibitions on Posey's consumption of drugs and alcohol—conditions he does not challenge on appeal.  CP at 162-63 (Condition 3: Do "[n]ot possess or consume controlled substances except pursuant to lawfully issued prescriptions" and condition 11: "Do not use or consume alcohol and/or Marijuana.").  Once imposed, the trial court was entitled to impose the breath and urine testing condition in order to enforce the drug and alcohol conditions regardless of their connection to the crimes.  Thus, we affirm the imposition of condition 12.

VI.  IMPOSITION OF LEGAL FINANCIAL OBLIGATIONS

Posey argues that after the trial court found him indigent, one portion of his judgment and sentence erroneously imposed community custody supervision fees, and therefore, we should remand for the trial court to strike this reference.  He also argues that the VPA should be stricken.  The State concedes that the case should be remanded for the trial court to strike the supervision fees and the VPA.

We accept the State's concession.  Community custody supervision fees are no longer authorized by statute and the VPA is no longer authorized for indigent defendants.  *State v. Ellis*, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023).  Accordingly, we remand to the trial court to strike the community custody supervision fees and the VPA.

CONCLUSION

We remand for the trial court to strike the community custody supervision fees and the VPA. Otherwise, we reject Posey's arguments and affirm his convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

CHE, J.